Clarence **SIPARY**, Appellant,

v.

**STATE of Alaska, Appellee.**

No. A–7813.

Court of Appeals of Alaska.

May 21, 2004.

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

This case involves the "rule of completeness", a common-law rule of evidence designed to prevent litigants from introducing portions of an out-of-court statement when these portions, taken out of context, would tend to be misleading. The rule of completeness states that when one party introduces portions of an out-of-court statement (whether oral or written), an adverse party is entitled to introduce remaining portions of the statement to the extent that this is necessary to correct any material misimpression that the initially offered portions might arguably create.

The present appeal arises from Clarence Sipary's prosecution for first-degree assault. At Sipary's trial, the prosecuting attorney introduced portions of four out-of-court statements made by Sipary. In these statements, Sipary admitted that he or his friend, Kenneth Tyson, beat the victim, Leo Stevens. But Sipary's attorney contended that these out-of-court statements also included Sipary's explanation of *why* he and/or Tyson struck Stevens. According to the defense attorney, Sipary explained that he and Tyson used force against Stevens because Stevens was trying to kill them. The defense attorney argued that the prosecutor should not be able to introduce abridged versions of Sipary's pre-trial statements when the abridgements omitted any mention of Sipary's alleged claim of self-defense (or, regarding Tyson's use of force against Stevens, defense of others).

The trial judge rejected the defense attorney's argument on hearsay grounds. The judge ruled that, under Evidence Rule 801(d)(2)(A) (the rule authorizing admission of statements made by an opponent), the prosecutor was entitled to introduce only those portions of Sipary's statements that he wished—and that, to the extent Sipary wished to offer any remaining portions of the

statements, these remaining portions were barred by the hearsay rule (Evidence Rule 802).

As we explain in this opinion, the rule of completeness was potentially applicable to Sipary's case. If Sipary's statements about striking the victim (or about Tyson's striking the victim) had indeed been directly coupled to assertions of self-defense (or defense of others), as the defense attorney contended, then these explanatory assertions would have been admissible under the rule of completeness once the prosecution chose to introduce the portions of the statements in which Sipary admitted that he and/or Tyson struck the victim.

But even though Sipary's trial attorney repeatedly contended that the State was presenting Sipary's statements out of context, in the sense that Sipary's statements were being mischaracterized by abridgement, the record does not bear out this contention. We therefore affirm Sipary's conviction.

*The rule of completeness, its relationship to Alaska Evidence Rule 106, and its relationship to the hearsay rule*

■ Under the common-law rule of completeness, "a party has the right to introduce the remainder of a writing [or] statement, correspondence, former testimony, or conversation that his or her opponent introduced" to the extent that this remainder "relates to the same subject matter and ... tends to explain or shed light on the meaning of the part already received".[1] The purpose of the rule "is to prevent a selective and out-of-context presentation of evidence from misleading the trier of fact"[2]—or, as stated by Wigmore, "to secure for the tribunal a complete understanding of the total tenor and effect of the utterance".[3]

The United States Supreme Court addressed the rule of completeness in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). In *Beech Aircraft,* the Court held that this common-

---

1. *State v. Warren*, 143 N.H. 633, 732 A.2d 1017, 1019 (1999).

2. *Warren*, 732 A.2d at 1019, citing J. Strong, *McCormick on Evidence* (4th ed.1992), § 56, Vol. 1 at 225–26.

3. J. Wigmore, *Evidence in Trials at Common Law* (Chadbourn rev.1978), § 2113, Vol. 7, p. 653.

law rule survived the enactment of the Federal Rules of Evidence. The Court declared it "obvious" that "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under [Federal Evidence] Rules 401 and 402".[4]

■■■ On the other hand, the rule of completeness does not mean that the entirety of a statement must be admitted if a litigant introduces a part. Rather, the admissibility of other portions of the statement is limited to those portions that are necessary to a proper understanding of the previously admitted portions. "[O]mitted portions of the statement need not be admitted if they are not relevant to explain or clarify the previously admitted statement." *Stumpf v. State,* 749 P.2d 880, 899 (Alaska App.1988).

Although Alaska Evidence Rule 106 is often referred to as a "rule of completeness", it is distinct from the common-law rule that we are discussing. The Supreme Court stated in *Beech Aircraft* that, although Federal Evidence Rule 106 (the federal counterpart to Alaska Evidence Rule 106) is premised on the common-law rule of completeness, it only "partially codifie[s]" this rule. The Court meant by this that there are instances in which evidence will be admissible under the rule of completeness irrespective of whether the evidence in question also qualifies for admission under Federal Evidence Rule 106.[5]

■■■ This distinction between the common-law rule of completeness and Evidence Rule 106 is even more clearly delineated in Alaska law. This court held in *Stoneking v. State*[6] that Alaska Evidence Rule 106 is not a "rule of completeness" in the sense that it *authorizes* the admission of the complementary evidence. Rather, the purpose of Rule 106 is more limited: it gives the parties against whom written or recorded evidence has been admitted the power to *accelerate*

*the timing* of their opportunity to introduce complementary evidence:

> The plain language of the rule does not categorically confer upon one party the right to admission of a complete written or recorded statement when an opponent has admitted only part. Instead, the rule confers the limited right to admit omitted portions of the statement that "ought in fairness be considered contemporaneously." The limited purpose of [Alaska Evidence Rule] 106 is to allow a party to admit omitted portions of a partially admitted statement only when and only to the extent that the omitted portions are necessary to provide context to the admitted portions, or to explain or clarify them.... The rule does not make admissible statements that would otherwise be inadmissible; it is meant only to allow contemporaneous admission of evidence that would ordinarily not be admissible until later stages of the trial. See [the] Commentary [to Evidence Rule 106] (1979).

*Stoneking,* 800 P.2d at 951–52.

The Commentary to Evidence Rule 106 (upon which the *Stoneking* decision relies) states that Rule 106 was designed to solve a problem of timing, not to enhance the admissibility of evidence. Based on the first paragraph of that Commentary, it appears that the drafters of Rule 106 assumed that the "standard rule [of completeness] at common law" survived under Alaska's codified rules of evidence. The problem to which Rule 106 is addressed (according to the first and second paragraphs of the Commentary) is that, under the common-law rule of completeness, a party who wishes to introduce the complementary evidence needed to put things in their proper context must often wait until their own case-in-chief, which may not occur until long after their opponent introduced the original portion of the statement. The second paragraph of the Commentary points out that "[when] time elapses between the offer of part of a statement and the offer of [com-

---

4. *Beech Aircraft,* 488 U.S. at 172, 109 S.Ct. at 451.

5. "[Because] the general rules of relevancy permit a ready resolution [of] this [question], we

need go no further in exploring the scope and meaning of [Federal Evidence] Rule 106." *Id.*

6. 800 P.2d 949 (Alaska App.1990).

plementary parts], the jury may become confused or find it difficult to reassess [the] evidence that it ... heard earlier in light of [the later-admitted complementary] material." Thus, Rule 106 gives the party the option to speed up the admission of the complementary evidence.

But this leaves at least two questions unanswered. First, because Rule 106 speaks explicitly of "writing[s]" and "recorded statement[s]", does this mean that the option of accelerated admission does not apply to evidence that complements oral statements? Some federal courts have declared that, even though Evidence Rule 106 does not apply to oral statements, Evidence Rule 611(a) gives trial judges a similar authority to grant accelerated admission to the complementary parts of an oral statement.[7]

(Evidence Rule 611(a) states, in pertinent part, that a trial judge "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... make the interrogation and presentation effective for the ascertainment of the truth".)

Second, if Evidence Rule 106 is not intended to affect the admissibility of evidence, but only the timing of its admission, what of situations where the particular out-of-court statement is admissible if offered by one party, but not admissible if offered by the other?

For example, criminal trials (such as Sipary's) often present instances in which the defendant's out-of-court statement is admissible if offered by the State (because it qualifies as a statement of a party-opponent under Evidence Rule 801(d)(2)), but inadmissible if offered by the defendant themself (because no hearsay exception applies). See Marino v. State, 934 P.2d 1321, 1331 (Alaska App. 1997); Stumpf v. State, 749 P.2d 880, 899 (Alaska App.1988).

In such situations, even though the rule of completeness might otherwise give the defendant the right to introduce complementary portions of their out-of-court statement (to explain the portions introduced by the State), does the rule of completeness allow the defendant to circumvent the hearsay rule? Courts are divided on this issue.[8]

Although we have noted these issues, we conclude that Sipary's case does not require us to resolve them. Instead, as we explain at some length in what follows, we conclude

**7.** See, for example, United States v. Castro, 813 F.2d 571, 576 (2nd Cir.1987); United States v. Li, 55 F.3d 325, 329 (7th Cir.1995); United States v. Haddad, 10 F.3d 1252, 1258 (7th Cir.1993); see also United States v. Mussaleen, 35 F.3d 692, 696 (2nd Cir.1994).

**8.** In Phoenix Associates III v. Stone, 60 F.3d 95, 103 (2nd Cir.1995); United States Football League v. National Football League, 842 F.2d 1335, 1375–76 (2nd Cir.1988); United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir.1996), and United States v. Burreson, 643 F.2d 1344, 1349 (9th Cir.1981), the courts held that, because Evidence Rule 106 does not render evidence admissible when it would otherwise be inadmissible, trial judges did not abuse their discretion when they refused to allow parties to use Rule 106 as a way of introducing inadmissible hearsay.

On the other hand, in United States v. Sutton, 801 F.2d 1346, 1368–69 (D.C.Cir.1986), the court declared that "Rule 106 can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously." In particular, see State v. Warren, 143 N.H. 633, 732 A.2d 1017, 1019–1020 (1999), and State v. Euge-

nio, 219 Wis.2d 391, 579 N.W.2d 642, 649–652 (1998), both holding that the rule of completeness allowed criminal defendants to introduce complementary portions of their out-of-court oral statements even though that evidence would normally be inadmissible hearsay.

In both Echo Acceptance Corp. v. Household Retail Services, Inc., 267 F.3d 1068, 1089 n. 12 (10th Cir.2001), and United States v. Pendas–Martinez, 845 F.2d 938, 944 & n. 10 (11th Cir. 1988), the courts acknowledged that federal circuit courts have reached conflicting decisions on the question of whether Federal Evidence Rule 106 makes admissible parts of a document that otherwise would be inadmissible.

See also Joseph M. McLaughlin, Jack B. Weinstein, & Margaret A. Berger, Weinstein's Federal Evidence (2nd ed.1997), § 106.03[1], at 106–14 (noting that the language of Federal Rule 106 is ambiguous as to "whether it authorizes the admission of otherwise inadmissible evidence"); cf. Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure (1977), § 5071, Vol. 21, pp. 337–340 (noting that Congress failed to take any action in response to a Justice Department request that a clause be added to Rule 106 to require "that evidence adduced under the Rule be otherwise admissible").

that the facts of Sipary's case do not raise an issue of completeness.

*Facts underlying the assault charge against Sipary*

On September 26, 1999, four men traveled by boat up the Yukon River from Saint Mary's to join Evan Kozevnikoff at his fish camp on Kashanuk Slough, near Pilot Station. These four men were Clarence Sipary, his friend Kenneth Tyson, and two brothers, Chet and Leo Stevens.

Before dawn the next morning (September 27), three of these men—Sipary, Tyson, and Leo Stevens—arrived by boat at Pilot Station. Sipary had been wounded in the foot by a shotgun blast, and he was in considerable pain. Leo Stevens had been badly beaten; he was lying curled up in the boat, shivering and mumbling. Both Sipary and Stevens were taken to the local clinic for treatment. At the clinic, Stevens stopped breathing and died.

The subsequent autopsy revealed that Stevens had suffered ten blunt force traumas to his head, as well as an additional ten or eleven blunt force traumas to his back and upper body. The medical examiner concluded, based on these injuries, that Stevens had been clubbed some two dozen times with one or more solid objects. Stevens died because the blows to his head injured his brain, causing the brain to bleed and swell and thus exert pressure on the brain stem—the portion of the brain that controls breathing and heartbeat.

Based on the results of a state trooper investigation, the district attorney's office concluded that there had been a fight at the fish camp between Leo Stevens and his brother Chet, on the one hand, and Sipary and his friend Tyson on the other. During this fight, Leo Stevens grabbed a shotgun and shot Sipary in the foot. Tyson escaped into the woods, but Sipary was immobilized by his wound, so he was forced to sit on the ground while Stevens held him at gunpoint. Some ninety minutes later, Tyson sneaked up behind Stevens and succeeded in subduing and disarming him. Sipary and Tyson then took revenge on Stevens by beating and clubbing him repeatedly—first at the fish camp, and then during the boat trip to Pilot Station.

The district attorney concluded that Tyson had administered most of this beating, since Sipary was largely incapacitated by his foot wound. However, the district attorney concluded that Sipary had urged Tyson to beat Stevens, both while they were at the fish camp and then later during the boat trip to Pilot Station. The district attorney further concluded that, during the boat trip to Pilot Station, Sipary had personally assaulted Stevens by picking up a .30–06 caliber rifle and clubbing Stevens three times with the weapon, until the stock broke.

Because the State concluded that Tyson had administered the major portion of the beating, Tyson was indicted for first-degree murder, while Sipary was indicted only for first-degree assault. Before Sipary's trial, Tyson accepted a plea bargain in which he pleaded no contest to manslaughter and agreed to testify against Sipary.

*Facts underlying the superior court's challenged evidentiary ruling*

Everyone directly involved in this incident was intoxicated. In particular, Kozevnikoff's four guests—Sipary, Tyson, and the Stevens brothers—had been drinking home brew from the time they started up the river from Saint Mary's, and they continued to drink after they arrived at the fish camp. Kozevnikoff had already retired to his tent before the fight started, so he had little relevant testimony to offer.

The victim's brother, Chet Stevens, was a witness to the early stages of the fight. He testified that he and his brother got into an argument with Sipary, and then the argument turned violent, with Sipary and his friend Tyson fighting Leo and Chet Stevens.

During the initial stages of this fight, Chet Stevens suffered injuries to his face and his ribs, both of which swelled up and gave him considerable pain. He escaped from further fighting by crawling into a tent. From inside the tent, Chet Stevens could hear the sound of continued fighting, and he could hear Sipary urging Tyson to beat up Leo Stevens, to "kick his ass". Then Chet passed out.

He was awakened a little while later by the sound of a gunshot. He also heard sounds

"like aluminum, ... like fighting in a boat". Then he passed out again, and he did not remember anything else until the following day, when the police arrived at the fish camp to investigate Leo Stevens's death.

The only eyewitness to offer a fuller account of the incident was Kenneth Tyson. As explained earlier, Tyson was initially indicted for the murder of Leo Stevens, but he agreed to plead no contest to a reduced charge of manslaughter, upon the condition that he testify at Sipary's trial. Tyson did testify at trial as he promised, but his testimony favored Sipary.

In his brief direct examination, Tyson acknowledged that, during the boat trip to Pilot Station, Sipary struck Leo Stevens with a shotgun, hitting him three times in succession. However, Tyson suggested that Sipary had acted in self-defense: he testified that Sipary struck these blows with the gun right after Sipary pulled the gun from Stevens's hands.

Tyson gave a more elaborate account when he was questioned by Sipary's attorney. Tyson testified that, during the boat trip to Pilot Station, Leo Stevens managed to obtain control of a shotgun and was "standing guard" over Sipary with this weapon. In response, Sipary (who was already shot in the foot) grabbed the gun and clubbed Stevens with it.

Tyson further testified that this was not the only time that Leo Stevens tried to gain control of a firearm during the boat trip to Pilot Station. Tyson asserted that Stevens reached for the firearms in the boat "a couple of times", and that he (Tyson) had to strike Stevens to prevent him from gaining control of a weapon, because he was afraid that Stevens would shoot someone again. Tyson testified that, other than the three blows with the rifle, he never saw Sipary strike Leo Stevens while they were together in the boat.

During redirect examination by the prosecutor, Tyson altered his account somewhat. He asserted that the events he had just described—Leo Stevens's holding a gun on Sipary, and Sipary's acts of grabbing the gun and then clubbing Stevens with it—occurred on the boat, but not during the ride to Pilot Station. Instead, these events occurred before they pushed off from the beach at the fish camp.

Thus, Tyson's final version of events undercut the State's theory of the case in two respects. First, Tyson asserted that Sipary never struck Stevens during the boat trip to Pilot Station; rather, Sipary struck Stevens while they were still at the fish camp. Second, and more important, Sipary struck Stevens only three times, and those blows occurred just after Stevens threatened Sipary with the weapon and Sipary wrested the gun from Stevens's hands.

Given Tyson's description of events, and given the limitations of Chet Stevens's testimony, the State's case rested to a large degree on other evidence: (1) the observations of the people who met the boat at the Pilot Station dock, (2) the results of the autopsy, (3) Tyson's prior inconsistent statements about what happened, and (4) Sipary's out-of-court statements concerning the incident.

With regard to Sipary's out-of-court statements, four witnesses testified about Sipary's descriptions of what had occurred.

*(a) The testimony of Richard Nick and Jennifer Polty; the defense attorney's failure to make an offer of proof as to what else Sipary allegedly said to these witnesses that might have been both (1) exculpatory and (2) improperly excluded*

■ Richard Nick, a resident of Pilot Station, was walking past the dock in the early morning of September 27th when he heard Tyson yelling for help. Nick went down to lend a hand. He saw that Sipary was wounded and moaning in pain, and that Leo Stevens was lying curled up in the boat. When Nick asked what had happened, Sipary said that Stevens shot him and that he (Sipary) hit Stevens in the head three times with a gun.

Jennifer Polty was a village police officer who was called to the scene. She testified that Sipary was in considerable pain from his gunshot wound and that he had a cut to his hand. Sipary told Polty that Stevens had shot him, and that he struggled with Stevens

for control of the gun. Sipary said that he sustained the cut on his hand during this struggle.

In arguments to the trial judge outside the presence of the jury, Sipary's attorney asserted that Sipary had said more than this to Nick and to Polty. According to the defense attorney, when Sipary spoke to Nick and, later, to Polty, he made more explicit assertions that he had acted in self-defense when he hit Stevens.

However, the defense attorney never explained what additional, allegedly exculpatory statements he was referring to. The defense attorney made only one offer of proof with regard to Sipary's statements to either Nick or Polty. This offer of proof occurred when the defense attorney questioned Nick outside the presence of the jury. In response to the defense attorney's *voir dire* questions, Nick gave answers that, if anything, undercut the defense attorney's assertion of self-defense and instead supported the prosecutor's assertion that Sipary assaulted Stevens out of revenge after all danger had passed.

Nick testified that Sipary told him that (1) Stevens had shot him, that (2) Tyson later took the gun away from Stevens, and that (3) Sipary then hit Stevens on the head three times with a rifle. When the defense attorney asked Nick whether (according to Sipary) the blows with the rifle had been struck "right after [Sipary] got shot?", Nick answered, "No; it was later on."

When (following this offer of proof) the defense attorney and the trial judge discussed whether Sipary's statements to Nick and to Polty might be admissible, their colloquy focused on various legal theories, but there was no discussion of the details of Sipary's statements. Rather, the defense attorney argued that *all* of Sipary's out-of-court statements to Nick and Polty were admissible—either as excited utterances, or as statements of present sense impression, or as statements of then-existing mental or

emotional condition, or as statements against penal interest. The defense attorney did not tie any of these legal theories to any particular statements that Sipary made.

The trial judge rejected all of the defense attorney's arguments, and Sipary renews only one of these arguments on appeal: the claim that his statements to Nick and to Polty were excited utterances under Alaska Evidence Rule 803(2). We deal with this claim in a later section of this opinion.

However, Sipary's attorney did make one other argument to the trial judge: an argument that essentially restated the rule of completeness. The defense attorney argued that if the State introduces a defendant's out-of-court statement in which the defendant admits striking someone who suffers injury or dies, it is appropriate to allow the defense to introduce the remainder of that statement if it contains the defendant's exculpatory explanation for striking the other person. The defense attorney asserted that, in Sipary's case, the prosecutor was "trying to [introduce] bifurcated, chopped-up parts of [Sipary's] statements"—parts that "[were being] taken out of context". He argued that, in such circumstances, Sipary's whole statement should be admitted.

But when the trial judge asked the defense attorney if he had any legal authority to support this proposition, the defense attorney conceded that he had none. Moreover, as we already explained, the defense attorney never offered any specifics to back up his claim that the prosecutor was offering a misleading abridgement of what Sipary said.

■ The trial judge ruled that, except for the portions of Sipary's statements that were introduced by the State as statements of a party opponent, Sipary's statements were inadmissible hearsay—*i.e.*, they were out-of-court statements, offered by the defendant to prove the truth of the matters asserted, with no applicable hearsay exception.[9]

---

**9.** Admission of a party's out-of-court statement under Evidence Rule 801(d)(2)(A) (which allows admission of the statement of a party opponent) is limited to admission of the evidence at the request of an *opposing* party, not at the request of

the party who made the statement. *See Marino v. State,* 934 P.2d 1321, 1331 (Alaska App.1997); *Stumpf v. State,* 749 P.2d 880, 899 (Alaska App. 1988).

The defense attorney returned to the issue of testimonial completeness at the end of that day of trial. As can be seen from the following colloquy, the trial judge reaffirmed his earlier ruling, but the judge also told the defense attorney that if the prosecutor was truly presenting Sipary's statements out of context, the defense attorney should bring the matter up outside the presence of the jury:

> *Defense Attorney:* [In this case, a prosecution witness] is going to be asked ... "What did [Sipary] say?", and the [prosecutor] is going to cut it off in mid-sentence. [The witness] is going to say that [Sipary said that] ... he hit Leo Stevens and, in the same sentence, [said that he] hit him because [of a particular reason]. The reason is going to be given [in Sipary's statement], but the court has indicated [that] the reason can't be [admitted].
>
> ...
>
> *The Court:* [T]he issue is whether, when the State introduces ... one statement, [and] there is part of the statement that's inculpatory, that the State wants to introduce, and there's ... a second portion that's exculpatory, ... can [that second part] be severed[?] [Can] the State ... go ahead [and introduce the inculpatory part] as an admission [of a party opponent], and the defense cannot get into the exculpatory [part]? ...
>
> *Defense Attorney:* Yes sir, I agree that [that is the] issue. And part of the problem is [that] you have to hear the [whole statement in] context before you make the ruling. [But] you've already made the ruling which would prohibit [admission of] the context. And that's the problem. You need to hear [the whole statement] first before you can say that [the exculpatory part] is to be excluded.
>
> *The Court:* Well, there's a protective order in effect. [But] I'm not precluding you from raising [this issue] again. And whatever the context shows ..., anything that's appropriate, [if it shows] that something different is going to be before the court, [then] certainly—but ... [your] application has to be made outside the presence of the jury.

> *Defense Attorney:* Yes, sir. And I'll make [my] application at the time that part of [my client's] statement is introduced[.] ... It's not like he made a statement one minute and [then], five minutes later, he made another statement. We're talking about a single statement which the court is truncating.

Despite the trial judge's announced willingness to reconsider the issue of testimonial completeness if the defense made an offer of proof, the defense attorney never asked the trial judge to revisit his rulings regarding the testimony of Nick and Polty. In particular, the defense attorney never made an offer of proof as to how Nick and Polty's testimony might have presented Sipary's statements out of context.

We therefore conclude that, with regard to the testimony of these two witnesses, Sipary failed to preserve a testimonial completeness challenge to the trial judge's rulings.

*(b) Sipary's argument that his statements to Nick and to Polty were admissible as excited utterances*

■ On appeal, Sipary also renews his argument that his out-of-court statements to Nick and to Polty qualified for admission as excited utterances under Alaska Evidence Rule 803(2). We reject this claim for two reasons.

First, as we explained in the last section, the defense attorney never made an offer of proof as to what statements, exactly, he believed were admissible as excited utterances.

Second, the trial judge ruled that, in any event, Sipary's statements to Nick and to Polty did not qualify as excited utterances. The judge concluded that even though Sipary may have been under stress at the time he spoke with Nick and with Polty, he also had time to reflect, he had time to fabricate, and he was not in such a state of excitement that it stilled his capacity to fabricate. The judge pointed out that, according to Richard Nick's testimony, no one in the boat seemed very excited.

■ When hearsay is offered under the excited utterance exception, the ultimate question is whether the proponent of the

evidence has shown that the circumstances surrounding the utterance "produce[d] a condition of excitement which temporarily still[ed] the speaker's capacity of reflection and produce[d] utterances free of conscious fabrication".[10] This is a question of fact, and we will uphold the trial judge's conclusion on this issue unless that conclusion is shown to be clearly erroneous.[11]

Having reviewed the record in Sipary's case, we conclude that the trial judge was not clearly erroneous when he ruled that the circumstances surrounding Sipary's statements to Nick and to Polty did not satisfy the test for excited utterances.

(c) *Sipary's argument that his statements to Kenneth Tyson were admissible as excited utterances*

■ Before turning to Sipary's interviews with Troopers Patterson and DeCoeur, we must address one last excited utterance claim. On appeal, Sipary claims that his out-of-court statements to his friend and erstwhile co-defendant, Kenneth Tyson, qualified as excited utterances.

At trial, Sipary's attorney asked the trial judge for permission to "bring Mr. Tyson back [to the stand]" so that the defense attorney could ask Tyson whether Sipary ever told him that he (Sipary) acted in self-defense or "that he took the gun away [from Leo Stevens] to keep from getting shot". As an offer of proof, the defense attorney asserted that "[Tyson] and [Sipary] have talked", and that Sipary said to Tyson "that [he] thought he was going to get killed, and [that] he took the gun away from Mr. [Stevens] in the boat, . . . and that's how [Sipary] believes that he cut his hand."

After hearing this offer of proof, the trial judge stated that the proposed testimony was "exculpatory, . . . self-serving hearsay", and that he "[had] not yet heard of any hearsay exception that applies [to this testimony]". Rather than asserting that Sipary's statements to Tyson qualified as excited utterances, the defense attorney replied simply, "I understand your rulings, Judge. . . . I just want to preserve the record."

Moreover, a few moments later, the defense attorney appears to have conceded that Sipary made these statements to Tyson while they were incarcerated together. This issue came up because the prosecutor demanded to know what part of the record the defense attorney was referring to when he asserted that Tyson would give the testimony outlined above:

*Prosecutor:* And [defense] counsel is saying, . . . "Mr. Sipary said that as well", and that's what I was looking for. . . . Where did Mr. Sipary ever make that version [of events] known? . . . [Defense] counsel has said [that] he wants to question all these people about Mr. Sipary's version [of events] that he made known, and I can't find it.

*Defense Attorney:* What counsel [for the State] doesn't have is a transcript of the conversations between Mr. Sipary and Mr. Tyson while they [were] both incarcerated in the same facility. There's no way that he would know what they said to each other.

If, as the defense attorney asserted, Sipary's statements to Tyson were made while the two of them were in jail together, then it is almost certain that Sipary's statements did not qualify as "excited utterances". This is, perhaps, the reason why the defense attorney did not rely upon an "excited utterance" theory when the trial judge challenged him to name an applicable hearsay exception.

(d) *The testimony of Trooper Martin Patterson; the defense attorney's offer of proof*

■ On the seventh day of trial, the prosecutor called Trooper Martin Patterson to the stand. Patterson was the law enforcement officer who interviewed Sipary at the Alaska Native Medical Center in Anchorage on September 28th (*i.e.*, two days after the incident).

On direct examination, Patterson testified that Sipary told him that everyone at the fish

---

**10.** *Blair v. State,* 42 P.3d 1152, 1154 (Alaska App.2002), quoting *Ryan v. State,* 899 P.2d 1371, 1378 n. 4 (Alaska App.1995).

**11.** *Blair,* 42 P.3d at 1154–55.

camp had been pretty drunk, and that an argument had turned into a fight, during which Sipary was shot in the foot. Sipary also told Patterson that, during the boat trip to Pilot Station, Tyson (but not Sipary) hit and kicked Stevens to make Stevens sit down in the boat.

A few moments later, the defense attorney asked for a mistrial, claiming that Patterson was mischaracterizing Sipary's statements. Specifically, the defense attorney contended that Patterson was leaving out the portions of Sipary's statements in which Sipary explained that he and Tyson "were defending [them]selves" and that Stevens "was trying to kill us". The defense attorney claimed that these explanatory statements were contained "in the very same sentence[s]" that Patterson had been referring to.

The defense attorney gave the trial judge a copy of the transcript of the interview, so that the judge could see what the defense attorney was talking about. Nevertheless, the trial judge reaffirmed his earlier ruling that Sipary could not introduce the exculpatory hearsay.

We have reviewed the submitted transcript of the interview, and it does not support the defense attorney's contention that Sipary's sentences were being chopped up or that Sipary's words were being mischaracterized through the excision of portions in which Sipary claimed to have acted in self-defense during the boat trip to Pilot Station.

We are about to discuss the content of the Patterson–Sipary interview in some detail. But before we do, it will be useful to recall the State's theory of the case. As explained above, the prosecutor conceded that Leo Stevens shot Sipary and forced Tyson to flee into the woods. But Tyson returned to the fish camp and overpowered Stevens. Then, after Stevens was subdued, Tyson and Sipary took revenge on Stevens by beating and clubbing him repeatedly. According to the prosecutor, Sipary's primary role was as the abettor of Tyson's assault, because Sipary was largely incapacitated by his foot wound. However, the prosecutor argued that, during the boat trip to Pilot Station, Sipary personally assaulted Stevens by picking up a .30–06

rifle and clubbing Stevens with the weapon until the stock broke.

Thus, the State's basic approach to the case was that Tyson and Sipary might have acted in self-defense at the fish camp when they attacked and subdued Stevens, but then Tyson and Sipary exceeded the bounds of self-defense when they continued to beat Stevens to exact retribution for what he had done earlier. With this in mind, we turn to the details of the Patterson–Sipary interview.

The interview lasted 47 minutes. At the beginning of the interview, Sipary told Patterson about the argument and fight at the fish camp, and about being shot by Leo Stevens. But Sipary made no mention of anyone acting in self-defense or in defense of others—at least, anyone other than Chet Stevens, who (according to Sipary) lay down on top of Sipary to shield him, so that Chet's brother Leo would not shoot Sipary.

Later in the interview, Sipary told Patterson that Kenneth Tyson had beaten Leo Stevens during the boat trip to Pilot Station. According to Sipary, Tyson announced his intention "to beat [Stevens] up for trying to kill [us]". Later, on the way to Pilot Station, Sipary saw Tyson hit Stevens "once or twice, to sit him down". Sipary then mentioned that Stevens "was trying to fight some more". This led to the following colloquy:

> *Patterson:* In what manner was [Leo Stevens] trying to do that?
>
> *Sipary:* Huh?
>
> *Patterson:* In what manner was he trying to fight?
>
> *Sipary:* Let's see—that, he was trying to kill us.
>
> *Patterson:* In the boat?
>
> *Sipary:* On land, before [indiscernible], because he was trying to kill us.
>
> *Patterson:* Okay. [But] why did [Tyson] hit [Stevens] while you were in the boat?
>
> *Sipary:* Because [indiscernible], I don't know.
>
> . . .
>
> *Patterson:* Was [Stevens] trying to fight?
>
> *Sipary:* I'm not sure.... I was pretty high.

*Patterson:* Did you see Leo get up in the boat?

*Sipary:* No, ... I don't think he got up.

*Patterson:* So you're not sure what— why [Tyson] hit Leo?

*Sipary:* Because he tried to shoot us.

*Patterson:* Okay, but he didn't try to shoot you while you were in the boat, did he?

*Sipary:* I don't think so.

*Patterson:* Okay. [So] why was [Tyson] hitting him on the way back ... to Pilot Station? Do you know?

*Sipary:* Pissed off, probably.

*Patterson:* Kenneth [Tyson] was pissed off?

*Sipary:* [Because] he got shot at, too. [Indiscernible] he ran into the trees.

. . .

*Patterson:* Okay. And you think Kenneth [Tyson] just hit [Stevens] because he was pissed off?

*Sipary:* Yeah, probably.... Well, [Leo Stevens] was trying to kill him, too.... Leo was trying to kill [both of] us.

*Patterson:* And that's what [Tyson] was ticked off about, and that's why he hit him in the boat?

*Sipary:* Yeah.

Thus far in the interview, Sipary had not asserted that he used *any* force against Leo Stevens, much less that he used force against Stevens in self-defense. Moreover, Sipary's account of Tyson's actions was consistent with the State's theory of the case: Sipary told Patterson that Leo Stevens attacked Sipary and Tyson at the fish camp and that, after Tyson subdued Stevens, Tyson beat Stevens repeatedly because he was angry that Stevens had shot at him and Sipary.

Half an hour into the interview (that is, about two-thirds of the way through the interview), Patterson paused briefly to flip the tape over, and then he asked Sipary to give a fuller description of the fight at the fish camp. It was then that Sipary made his first assertion of self-defense. Sipary told Patterson that, after Stevens shot him in the foot, he grabbed for the gun that Stevens was holding, and that the gun sight cut his hand.

Sipary then asserted that he had clubbed Stevens with a gun. At one point, Sipary seemingly stated that he used *his own* gun to hit Stevens; at another point, he claimed that he wrested the gun from Stevens and hit him with it. Sipary was unable to clearly identify the timing of this event. He did say, however, that his use of force against Stevens occurred at the fish camp, not on the boat trip to Pilot Station:

*Patterson:* After [Leo Stevens] shot you, you hit him?

*Sipary:* Yeah, and I think that's how I got this [cut]. I grabbed that gun [indiscernible], and it cut me here.

*Patterson:* Okay, and ... what did you hit him with?

*Sipary:* My gun. I clubbed him once.

*Patterson:* You hit, clubbed him once with a gun?

*Sipary:* Yeah.

*Patterson:* And this was right after he shot you?

*Sipary:* Yeah.

*Patterson:* Okay.

*Sipary:* But I'm not [indiscernible] still right after, not right away.

*Patterson:* Was it in the boat ... when you grabbed the gun?

*Sipary:* Yeah, um, I think that's how I got cut.

. . .

*Patterson:* Okay, so you took the gun away from him and ... hit him with it?

*Sipary:* Yeah, once. Otherwise, I would have got shot. I was already shot [once].

*Patterson:* Okay, did you ever hit Leo after that?

*Sipary:* No.

. . .

*Patterson:* Now, did you see [Kenneth Tyson] hit Leo while you were in the boat?

*Sipary:* Yeah.

*Patterson:* Okay. How many times?

*Sipary:* Couple of times. Ah, I told [Tyson] to hit him once for me.

*Patterson:* What was Leo doing ... when that happened?

*Sipary:* On the boat?

*Patterson:* Yeah.

*Sipary:* Sitting there.

*Patterson:* Was he saying anything?

*Sipary:* Um, I don't think so.

*Patterson:* Was he doing anything?

*Sipary:* Not really. Um, it was pretty dark, so I couldn't see. I was laying down; I couldn't even take off my boots right.

*Patterson:* Okay.... Did *you* strike [Leo Stevens] while he was in the boat?

*Sipary:* No.

Sipary went on to say that he struck Leo Stevens with a gun twice (not three times), and that he thought one of these blows was to Stevens's head while the other was to his leg. Sipary then reiterated that he had not struck Stevens while they were together in the boat.

When this interview is examined as a whole, it does not bear out the defense attorney's contention that the prosecutor or Trooper Patterson were misleadingly chopping up Sipary's answers to delete any reference to self-defense. It is true that Sipary eventually mentioned self-defense during the interview—but not, as the defense attorney asserted, in the "very same sentences" that Trooper Patterson referred to during his direct examination at Sipary's trial. Rather, the interview had been going on for more than half an hour before Sipary even admitted that he had struck Stevens at all, much less asserted self-defense as his justification for striking these blows.

Moreover, the portion of Patterson's testimony that the defense attorney objected to— that is, Patterson's assertion that Sipary told him that Tyson hit and kicked Stevens during the boat trip to Pilot Station—was an accurate description of what Sipary said. Contrary to the defense attorney's contention when he moved for a mistrial, Sipary did not couple this statement with an assertion that Tyson acted in self-defense. Instead (as can be seen from the excerpts of the interview quoted above), Sipary asserted that Tyson attacked Stevens during the boat trip because he was "pissed off" at Stevens on account of what Stevens had done back at the fish camp. In fact, Sipary urged Tyson to continue this assault, telling him to hit Stevens "once for me".

Finally, the use of defensive force that Sipary described in the interview is not the use of force that formed the basis of the assault charge. As explained above, the prosecutor alleged that Sipary used a rifle to strike Stevens during the boat trip from the fish camp to Pilot Station, after Stevens was subdued and the need for defensive force had ended. In Sipary's interview with Patterson, Sipary stated that he had used force against Stevens when they struggled for control of the gun at the fish camp, but Sipary repeatedly declared that he never struck Stevens during the boat trip. That is, Sipary never told Patterson that he acted in self-defense when he struck Stevens with a rifle during the boat trip. Instead, Sipary denied striking Stevens in any fashion during that trip.

This is, in fact, the theory of defense that Sipary's attorney ultimately argued to the jury: that Sipary had acted in justifiable self-defense at the fish camp when he used force to disarm and subdue Stevens—and that, after Stevens was disarmed and subdued, it was Tyson who repeatedly and unjustifiably beat Stevens during the boat trip to Pilot Station. The defense attorney told the jury: "It's a tragedy that Leo Stevens is dead. [But] my client didn't kill him. Ken Tyson beat him to death."

Thus, Sipary's interview with Patterson does not raise an issue of testimonial completeness. To the extent that the trial judge's ruling on this point of law may have been mistaken in the abstract, Sipary was not harmed by that mistake.

*(e) The testimony of Trooper David DeCoeur; the defense attorney's offer of proof; the trial judge's altered ruling*

 The State's final witness was Trooper David DeCoeur, the law enforcement officer who interviewed Sipary in Pilot Station on the morning of September 27th, before Sipary was medivacked to Anchorage.

DeCoeur testified that, during his interview with Sipary, he repeatedly asked Sipary whether Sipary had struck Leo Stevens with a gun. According to DeCoeur, Sipary re-

peatedly denied striking Stevens—either with a gun, or a club, or even his fists. DeCoeur also stated that Sipary never specifically asserted that he had acted in self-defense.

At this point, the defense attorney objected that Sipary's statements to DeCoeur were "replete with comments about how he took the firearm away from Leo Stevens and then acted ..., which any [normal] person would understand [as] acting in self-defense". He argued that DeCoeur had seriously mischaracterized Sipary's statement, even though it may technically have been true that Sipary never used the term "self-defense".

The trial judge decided to reserve his ruling on this issue until the next day, so that he would have the opportunity to review the transcript of DeCoeur's interview with Sipary.

When the parties returned to court the next day, the prosecutor conceded that Sipary told DeCoeur that "Leo [Stevens] went crazy", and that they had fought, and that Sipary punched Stevens once in the face during that fight. But, according to the prosecutor, Sipary told DeCoeur that this had happened before Leo Stevens shot Sipary, before Tyson returned to the fish camp to disarm and subdue Stevens, and before the boat trip to Pilot Station. The prosecutor asserted that, in the interview, Sipary told DeCoeur that after he was shot, all he could do was lie on the ground—and that it was Tyson who returned to the fish camp, disarmed Stevens, and then beat him.

The prosecutor told the judge that none of this suggested that Sipary had a self-defense claim. The prosecutor stated that the criminal charge against Sipary was not based on any force that Sipary might have used against Stevens during the initial fight at the fish camp. Rather, the assault charge against Sipary was based on the allegation that Sipary struck Stevens after the shooting and after Stevens had been disarmed.

We have examined the transcript of the interview, and it supports the prosecutor's characterization of what Sipary said. In his interview with DeCoeur, Sipary repeatedly asserted that he did not engage in any fighting or in any other use of force after he was shot.

In particular, Sipary told DeCoeur that, after Stevens shot him, Stevens stood over him with the shotgun pointed at his head; Sipary was wounded, so he "couldn't do nothing" but lie down and wait. Then, according to Sipary, Tyson returned to the camp and beat Stevens for some length of time, perhaps ten minutes. DeCoeur repeatedly asked Sipary if he had joined Tyson in hitting Leo Stevens; Sipary's answers were "No", and "I couldn't do nothing," and "I [lay] there and couldn't move."

But although Sipary repeatedly told DeCoeur that he had not personally used force against Stevens (that is, after he was shot), some of Sipary's statements about *Tyson's* use of force against Stevens were ambiguous. Viewed one way, Sipary's statements could be construed as assertions that Tyson beat Stevens out of revenge, because he was angry that Stevens had tried to kill them. But viewed another way, Sipary's statements could be construed as assertions that Tyson was forced to beat Stevens in defense of himself and Sipary.

After the trial judge reviewed the transcript, he concluded that Sipary was entitled to admission of these portions of the interview—not under the rubric of testimonial completeness, but rather as rebuttal to DeCoeur's testimony that Sipary had not asserted "self-defense" during the interview. Specifically, the trial judge ruled that the jury should hear Sipary's statement that Leo Stevens "went crazy" for no apparent reason, that Stevens almost killed Sipary, that Stevens stood over the wounded Sipary, aiming a gun at his head, that Stevens threatened to kill Sipary, and that Sipary was wounded and could do nothing to help himself.

On appeal, Sipary argues that a few other statements he made during this interview should also have been admitted under the doctrine of testimonial completeness. But we conclude that, even if this were true, any error would be harmless in light of the trial judge's decision to admit the above-described portions of the interview.

*Conclusion*

Sipary's primary contention is that government witnesses gave testimony that mischaracterized Sipary's out-of-court statements through abridgement—by chopping up his sentences to filter out his exculpatory explanations and leave only his inculpatory utterances. If this had been true, then Sipary's trial attorney would have been entitled to correct the mischaracterization by requiring admission of those omitted portions that were necessary to present the true context of Sipary's statements. But based on the record before us, Sipary has failed to show that the prosecution witnesses materially mischaracterized his out-of-court statements. Thus, to the extent it might be argued that the trial judge failed to properly acknowledge the rule of testimonial completeness in some of his rulings, any error was harmless.

The judgement of the superior court is AFFIRMED.