Edward H. ACTIVE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8984.

Court of Appeals of Alaska.

March 9, 2007.

34. This decision moots the cross-appeal.

Dan S. Bair, Assistant Public Advocate, and Chad W. Holt, Supervising Assistant Public Advocate, Anchorage, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Edward H. Active appeals his convictions for first-degree burglary, attempted first-degree sexual assault, and fourth-degree assault. Active argues that the trial judge improperly allowed the State to play (and the jury to hear) audio tapes of the victim's prior statements to a police investigator. Active also argues that the trial judge improperly allowed the State to introduce evidence of Active's 1993 conviction for second-degree sexual assault (involving another victim). Finally, Active argues that he was sentenced in violation of his Sixth Amendment right to jury trial as interpreted in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

For the reasons explained here, we conclude that the challenged evidence was properly admitted, and we also conclude that Active's sentencing conformed to *Blakely*. We therefore affirm Active's convictions.

*Background facts: the State's case against Active*

The charges in this case arose from events that occurred in August 2003 in Twin Hills and Togiak. Active was involved in a long-term romantic relationship with C.M. C.M. had a house in Togiak, and Active often stayed with her. During their relationship, Active was occasionally physically violent toward C.M., to the point of bruising her, but C.M. repeatedly refused to bring charges (or to cooperate in the investigation of potential charges).

On August 3, 2003, Active and C.M. were visiting friends in the village of Twin Hills. Active thought that C.M. was paying too much attention to another man, and he began "roughing up" C.M. C.M. telephoned her mother in Togiak and asked her for assistance. In response, C.M.'s mother called a family friend, Gladys Small, who lived in

Twin Hills, and asked her to check on C.M.'s welfare.

Small went looking for C.M. When she found her, she observed that C.M.'s face and eyes were swollen and bruised. Small and her boyfriend transported C.M. back to her mother's house in Togiak. When C.M.'s mother saw her daughter's bruises, she called the police. However, C.M. refused to allow the police to take photographs of her bruises, and she would not bring charges against Active.

Even though C.M. declined to press charges for the August 3rd assault, she did ask Active to leave her house and stay somewhere else for a while. C.M. also contacted her brother and had him install a new metal plate on her door, so that it could be locked securely.

In the early morning of August 7th, Active came to C.M.'s house and started to break in. While this was happening, C.M. telephoned her stepsister, June Logusak. C.M.'s nephew, Craig Logusak, answered the telephone. C.M. sounded scared, and (over the telephone) Craig could hear a sound similar to the sound of metal striking metal. (The metal reinforcement of C.M.'s door sustained damage during that night.)

C.M. asked Craig to have his mother (*i.e.,* C.M.'s stepsister) come to her aid immediately because someone was trying to break in through the door. Craig woke up his parents and told them that C.M. needed help.

June Logusak and her husband threw on some clothes and ran to C.M.'s house. Logusak knocked on the door for several minutes, but no one answered. She then tried to open the door, but it would not open. Logusak and her husband then went around to the side of the house where C.M.'s bedroom was located. A light was on in the bedroom, the bedroom window was broken, and a blanket was hanging over the broken window.

Logusak called out to C.M., but C.M. did not immediately answer. When C.M. finally responded, Logusak announced that she and her husband were outside the window, and they wanted to know if C.M. was all right. When Logusak asked C.M. if she was alone, C.M. mumbled a response, but Logusak heard C.M. say "Aki"—C.M.'s pet name for Active.

Logusak and her husband stood outside the window for twenty minutes, waiting to see if anything else happened, and trying to assure themselves that C.M. was all right. They then returned to their home.

Both C.M.'s mother and C.M.'s brother called her house around 8:00 in the morning, but C.M. did not answer their calls. However, a short time later, C.M. came out of her house. C.M.'s mother (who lived just a few feet away) saw that C.M. was crying and that her face was bruised. C.M. said that she had been sexually assaulted, and that she was tired of being beaten up.

C.M. then went to the local clinic, where it was discovered that she had suffered a perforated eardrum. This time, C.M. allowed the clinic staff to take photographs of her bruises.

Togiak Police Officer John Kirby went to the clinic and interviewed C.M. C.M. told Kirby about the earlier assault in Twin Hills, and how she had told Active to leave her house, as an alternative to pressing charges against him. With respect to the assault that had just occurred, C.M. told Kirby that Active assaulted her because he thought he had heard C.M. with someone else in her bedroom.

C.M. described how Active had broken into her bedroom: he threw an object against the window pane and broke it, then reached in and slid the window open. Active then physically and sexually assaulted C.M. for hours. C.M. cried and told Active to leave, but she did not fight back because she feared that Active would hurt her worse if she did. Active finally left (again, by climbing through the window) after it became day and C.M.'s mother started calling her house, and Active realized that more people would be coming to the house to check on C.M.

The next day (August 8th), Kirby conducted a follow-up interview with C.M. C.M. confirmed that Active had broken into her house by breaking the window and that Active had sexually attacked her—although she said that he did not succeed in penetrating her. C.M. also told Kirby that, during the

attack, Active threatened her with a pair of scissors. And she reiterated that Active left her house only after her mother and brother both called, and Active realized that people would be coming to check on C.M.

Based on these events, Active was charged with first-degree burglary, attempted first-degree sexual assault, and two counts of fourth-degree assault—one for the physical assault that accompanied the attempted sexual assault in C.M.'s house, and the other for the previous assault in Twin Hills.

Two months after Active was indicted, C.M. executed an affidavit in which she declared that she had "maliciously, intentionally[,] and untruthfully accused Edward Active of wrong doing". C.M. stated in this affidavit that "Edward never sexually assaulted [her]" and that "any sexual activity between [them] has always been consensual". C.M. further stated that Active had not burglarized her house. Rather, she declared, "Edward has always had access to our home", and he never came into the house "through any other way [than] through the front door". C.M. declared that she had lied about Active because "[she] was angry with [him] after hearing many rumors of [his] infidelity."

*C.M.'s testimony at Active's trial, and the State's request to play the audio tapes of her two interviews with Officer Kirby*

One of the major issues presented in this appeal is whether the prosecutor laid a sufficient foundation for the introduction of C.M.'s out-of-court statements to Officer Kirby. These statements were offered as prior inconsistent statements, so the State was obliged to comply with the foundational requirements of Alaska Evidence Rule 801(d)(1)(A) and Alaska Evidence Rule 613(b) before offering the statements.

Rule 801(d)(1)(A) states that, "[u]nless the interests of justice otherwise require", a witness's inconsistent statements "shall be excluded unless ... the witness was so examined while testifying as to give the witness an opportunity to explain or to deny the statement[,] or ... the witness has not been excused from giving further testimony in the action".

Rule 613(b) states that "[b]efore extrinsic evidence of a prior contradictory statement [of a witness] may be admitted, the examiner shall lay a foundation for impeachment by affording the witness the opportunity, while testifying, to explain or deny [the contradictory] statement, ... except as provided in subdivision (b)(1) of this rule." Subsection (b)(1) states that the court has the discretion to allow the inconsistent statement to be introduced before the required foundation is laid, and to have the witness later "recalled for the purpose of laying a foundation for impeachment", if the court is "satisfied that [the examiner's] failure to lay a foundation earlier was not intentional, or if intentional was for good cause". In addition, subsection (b)(1) authorizes the court to allow the introduction of the inconsistent statement even if no foundation is ever laid, if the court is convinced that introduction of this evidence is "in the interests of justice".

Because Active challenges the adequacy of the government's foundation for C.M.'s prior statements to the investigating officer, we will describe the prosecutor's examination of C.M. in some detail.

C.M. was called as a government witness at Active's trial. However, as explained more fully below, C.M. claimed to remember little of what had happened to her, and little of what she had said to other people about these events.

C.M. was insistent on only three points. First, Active had not burglarized her house by breaking in through the window; rather, he used his key to enter her house. Second, Active had not sexually assaulted her; rather, they had engaged in consensual sex. Third, although C.M. claimed not to remember exactly what she told Officer Kirby, she declared that, to the extent that she had accused Active of burglarizing her house and sexually assaulting her, her statements to Kirby were lies—accusations that she invented because she was upset with Active and wanted to get him in trouble.

With this preface, we now turn to the details of the prosecutor's direct examination of C.M.

When the prosecutor asked C.M. about the assault that occurred at Twin Hills, C.M. acknowledged that she and Active went to visit friends in that village, and that Active became angry at her because he thought that C.M. was "coming on to somebody else". C.M. recalled "struggling" with Active, but when the prosecutor asked C.M. if Active struck her, C.M. declared, "I don't remember."

C.M. admitted that the police wanted to take photographs of her, so that they could file charges, but C.M. did not allow this.

C.M. admitted that she described these events to Officer Kirby when he interviewed her, but C.M. could not remember what she told him.

The prosecutor then asked C.M. if she remembered something happening to her on the day of the incident in this case. C.M. answered, "No." The prosecutor then prompted, "Do you remember [that] somebody broke your window?" C.M. answered, "Yes." The following colloquy ensued:

*Prosecutor:* Okay. Tell us the first thing you remember from that date.

*C.M.:* Just that there was a window being broken, and I picked up the telephone and called my stepsister.

*Prosecutor:* Now, who was in your house [at that time]?

*C.M.:* Just myself.

*Prosecutor:* Okay.... Who did you talk to on the phone at your stepsister's house?

*C.M.:* My nephew [Craig] answered the phone.

*Prosecutor:* ... And do you remember what you told Craig?

*C.M.:* No, I don't.

*Prosecutor:* Isn't it true that you told him that someone was banging on your door and trying to get into your house?

*C.M.:* I don't remember.... I don't remember exactly what I said to him.

*Prosecutor:* ... What did you ask your nephew to do?

*C.M.:* I don't think I asked him to do anything. I don't remember the conversation with him.... I don't recall.

*Prosecutor:* Why did you call over there if you weren't going to ask him to do anything?

*C.M.:* I don't know. I just don't remember what I said to him.

The prosecutor then asked C.M. to describe what happened that night after her window was broken. C.M. responded, "I don't remember a lot of that evening. I know [that Active] was there; he was there with me." The prosecutor then told C.M. that he wanted to take her narrative "step by step":

*Prosecutor:* You were asleep when your window was broken, is that correct? (Pause) You've got to answer out loud ...

*C.M.:* Yes.

*Prosecutor:* ... And, so, what's the next thing you remember after your window being broken?

*C.M.:* Being on the telephone, calling Craig's [house].

*Prosecutor:* Okay. And then what's the next thing you remember after that?

*C.M.:* I don't remember a whole lot of that evening. I don't know.

*Prosecutor:* Well, I'm just asking you what the next thing was.

*C.M.:* Talking to him [*i.e.*, Active]. Laying in bed with him.

*Prosecutor:* Okay. You don't remember how he got into the house?

*C.M.:* He came to the door.

*Prosecutor:* Okay. So were you in bed with [Active] at the time your stepsister came over—Ms. Logusak?

*C.M.:* Yes.

*Prosecutor:* Okay. And how long do you think it took [your stepsister] to get over [to your house]?

*C.M.:* I don't know. I don't know.

*Prosecutor:* [But] sometime between the time the window got broke[n] and the time Ms. Logusak came over, Mr. Active came in [through] your front door?

*C.M.:* Yes.

*Prosecutor:* Okay. And he immediately lay down in bed with you?

*C.M.:* I don't remember. I know we were talking, and I was asking [him] about where he was, and . . .

*Prosecutor:* Okay. Had you invited him into the house?

*C.M.:* [No,] he came in with his key. . . .

*Prosecutor:* Okay. And did you [two] talk about someone breaking your window?

*C.M.:* No, I don't remember talking about that.

C.M. testified that she lay in bed with Active all night after that. When the prosecutor asked C.M. if anything happened during that time, C.M. admitted that she and Active "[got] into some struggles, . . . where [she] was yelling and . . . was upset, [and Active] had his hand over [her] mouth". The prosecutor asked C.M. if Active had hurt her when he placed his hand over her mouth. She responded, "I don't remember it hurting[;] it did leave some bruises, though."

C.M. claimed that she and Active parted in the morning on bad terms: C.M. was upset because Active was seeing another woman. After Active left, C.M. went to her mother's house and "told [her] mother some things, and she [*i.e.,* her mother] called the cops." But when the prosecutor asked C.M. if she recalled what she had told her mother, C.M. answered, "I don't remember at all."

C.M. then testified that, after the police arrived, she was taken to the local clinic. C.M. described her condition as, "I couldn't hardly hear out of my right ear [it turned out that her eardrum was perforated] and I had bruises on my face." C.M. attributed all of these injuries to "the Twin Hills trip". But when the prosecutor asked C.M. if she remembered how all of this had happened to her, C.M. answered, "No."

C.M. remembered talking to Officer Kirby. But when the prosecutor asked C.M. if she told Kirby "what was going on, and why [she was] injured", C.M. answered, "I don't remember what I . . . told him."

C.M. stated that, although she truthfully described "the Twin Hills situation" to Kirby, she lied to Kirby "about the situation that happened the night before" because she "was still really angry with Edward". In particular, C.M. testified that she lied to Kirby

when she said that Active had crawled through her window and assaulted her.

When the prosecutor asked C.M. if she remembered what else she had told Kirby, C.M. answered, "No. I was—I was upset. I was upset." When the prosecutor asked C.M. if she remembered telling Kirby that she had removed her window covering during the night, hoping to attract the attention of a neighbor or passerby, C.M. answered, "I don't remember." When the prosecutor asked C.M. if, on the day before this incident, she had asked her brother to reinforce her door, C.M. answered, "I don't remember if I did. . . . I don't remember ever asking him to help me with the door. But it's been so long. . . . He could have [reinforced the door]."

When the prosecutor asked C.M. how her front door had later sustained damage, she answered, "I don't remember." The prosecutor asked C.M. if she remembered telling her brother that Active had broken her door. C.M. responded, "I don't remember. . . . I don't remember telling him anything about my door being broken."

C.M. declared that she had suffered no injuries that night. When the prosecutor reminded her that she had already testified that Active bruised her mouth when he held his hand over it, C.M. replied that she did not remember any other bruises.

The prosecutor showed C.M. a photograph of C.M. that was taken at the clinic on the morning after the assault. C.M. declared that she did not remember when that photograph was taken. When the prosecutor asked if this photograph depicted the bruises that were on C.M.'s face after her night with Active, C.M. declared that the bruises depicted in the photograph had all been sustained four days earlier, during the Twin Hills incident.

The prosecutor then showed C.M. a photograph of her hand, this one again depicting injuries. When the prosecutor asked C.M., "Was your hand injured?", C.M. replied, "I don't remember. I don't remember." The prosecutor pursued the matter: "Do you have any idea how your hand could have

gotten injured that way?" C.M. replied, "No."

The prosecutor then showed C.M. another photograph, this one depicting bruises to her shoulder. He asked C.M., "Do you know how those bruises happened?" C.M. answered, "No.... I don't remember." The prosecutor showed C.M. a photograph depicting bruises to her forearm. C.M. stated that she did not know how she sustained those bruises.

Toward the end of the examination, the prosecutor asked C.M. if she remembered calling the district attorney's office on August 13th (i.e., about one week after the assault) and asking the authorities to drop the charges against Active. C.M. responded, "I don't remember that phone call."

All told, during the prosecutor's direct examination of C.M., there were more than fifty times when C.M. answered either "I don't know" or "I don't remember" to questions regarding what had happened to C.M., and what she had said to her relatives and to the authorities about these occurrences. However, C.M. demonstrated no such uncertainty on the three main points favorable to Active's defense: that Active had not broken into her house, that Active had not sexually assaulted her, and that everything she might have said to the contrary in her two interviews with Officer Kirby was a lie.

After C.M. was excused from the stand, the prosecutor asked Superior Court Judge Fred Torrisi for permission to play the audio tapes of C.M.'s interviews with Kirby. These tapes were offered under Alaska Evidence Rule 801(d)(1)(A), as C.M.'s prior inconsistent statements. Active's attorney objected, arguing that the prosecutor had failed to lay the proper foundation for introducing this evidence.

The defense attorney asserted that the prosecutor should have played the two tapes while C.M. was still on the stand—directly confronting C.M. with each purported inconsistency, then asking her whether she conceded making that particular assertion and, if so, whether she had an explanation for it:

*The Court:* So, your objection ... is what?

*Defense Attorney:* [The party seeking to introduce evidence of a prior inconsistent statement must] confront the witness with [the] prior inconsistent statement.... The prior statement should be played [while the witness is on the stand], to give the witness an opportunity to respond to it. [If the tapes are played now], the jury won't be able to see how [C.M.] reacts to [the prior statements, and] there won't be any further [opportunity] for cross-examination of [C.M.] regarding the prior inconsistent statements.

*The Court:* Well, I note that [C.M.] is still here [and] could be recalled [to the stand]. But you're saying that [no proper foundation has been laid]? I mean, [the prosecutor] did confront [C.M.] with [the prior statements] in the sense that he [asked her], "You talked to Kirby and you told him something else, right?" So you're saying [that the prosecutor] has to actually go line by line, or sentence by sentence, play[ing] the tape while [C.M.]'s up there [on the stand]?

*Defense Attorney:* I—[yes,] that's what I request.

In addition to arguing that C.M.'s statements to Kirby were inconsistent with her testimony in court, the prosecutor advanced a separate theory for admitting the two tapes. As explained above, C.M. conceded that she had told Kirby that Active had broken into her house and sexually assaulted her; however, she asserted that she had been lying when she made these accusations (because she was angry that Active had been seeing another woman). The prosecutor argued that, given this situation, the audio tapes were relevant not only for the factual statements recorded on them, but also because they demonstrated C.M.'s demeanor when she made these statements—thus potentially helping the jury to decide whether to believe or disbelieve C.M.'s current assertion that all of her prior accusations were falsehoods motivated by jealousy.

During the middle of this discussion, Judge Torrisi noted that C.M. (the declarant who made the challenged out-of-court statements) had been excused and was headed toward the courtroom door. The judge told the parties,

"If anybody wants me to ... order ... her [to] stay until we're done with this discussion, I can do that." Active's attorney responded, "I would [ask you to do that], Judge." Judge Torrisi immediately directed an officer to tell C.M. that she was still under subpoena, although she was free to leave the courtroom.

Judge Torrisi ultimately ruled that the prosecutor could play both tapes for the jury. Active challenges this ruling on appeal.

Judge Torrisi's ruling actually involves three different aspects of evidence law. First, when a party wishes to introduce a witness's prior inconsistent statements, and those statements are recorded either in writing or on tape, must the party show the witness the writing, or play the tape for the witness, before questioning the witness about the prior statements? Second, in instances where the witness *admits* having made the inconsistent statements, may the proponent of the evidence nevertheless proceed to introduce extrinsic evidence of those statements? And third, when a party examines a witness about the witness's prior statements, must the party ask the witness about each and every prior factual assertion that the party intends to introduce? Or is it sufficient that the party ask the witness to admit or deny the primary contentions made by the witness on the prior occasion?

■ The first issue is whether, if the prior statements are preserved in written or taped form, the proponent of the evidence must reveal the precise content of the writing or the tape to the witness before questioning the witness about those statements. The answer to this question is found in Alaska Evidence Rule 613(b)(2):

In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

As explained in paragraphs 5 through 7 of the Commentary to Evidence Rule 613(b), this provision of our evidence rules was intended to supersede the contrary rule at common law, which was known as the "rule in *Queen Caroline's Case*".[1]

■ The next question is whether the State should have been allowed to introduce extrinsic evidence of C.M.'s prior statements, given the fact that C.M. did not deny making those statements. (As explained above, C.M. claimed not to remember many details of what she had said to Officer Kirby; but she declared that, to the extent that she accused Active of criminal conduct, her statements to Kirby were lies.)

Several jurisdictions follow the rule that if a witness admits making the prior statements, no extrinsic evidence of those prior statements may be introduced.[2] However, Alaska does not follow this rule.

In *Bentley v. State*, 397 P.2d 976 (Alaska 1965), our supreme court held that it was error for a trial judge to exclude extrinsic evidence of a witness's prior inconsistent statement when (1) the crucial issue at trial was whether the jury should credit the witness's present testimony or should instead credit her prior inconsistent statement, and (2) the extrinsic evidence offered by the defendant—an audiotape—demonstrated the complete context of the witness's prior statement.[3] For these reasons, the court concluded that there was a reasonable possibility that the jury would view the facts differently if they heard, not simply the witness's unelaborated concession that she had previously made inconsistent statements, but the tape of the conversation in which she had made those statements.[4]

In *Clifton v. State*, 758 P.2d 1279, 1283 (Alaska App.1988), this court construed *Bentley* to mean that, when a witness admits making the prior statement, the trial judge has the discretion to admit extrinsic evidence

1. 2 Brod. & Bing. [Broderip & Bingham's Court of Common Pleas Reports] 284, 286–290; 129 Eng. Rep. 976 (1820).

2. *See, e.g., Dilley ·v. Chesapeake & Ohio Railway Co.*, 327 F.2d 249, 251 (6th Cir.1964); *United*

*States v. Greer*, 806 F.2d 556, 559 (5th Cir.1986); *Brown v. State*, 682 So.2d 340, 345 (Miss.1996).

3. *Bentley*, 397 P.2d at 978.

4. *Id.* at 978–79.

of the prior statement if the extrinsic evidence will aid the jury's resolution of the case and will not be unduly prejudicial. And in *Nunn v. State,* 845 P.2d 435 (Alaska App. 1993), we applied the *Bentley* rule to a situation similar to the one presented in Active's case.

In *Nunn,* the victim conceded that she had accused the defendant of criminal activity during a police interview, but she insisted that those accusations had been false. We held that the trial judge had properly allowed the State to play the tape of the victim's interview with the police:

> [O]ne of the critical issues facing the jury was whether to credit [the victim's] trial testimony or her conflicting prior statements. Had [the victim] been lying when she accused Nunn of sexually abusing her, or was [the victim] lying when she testified that no sexual abuse had occurred? Here, a videotape preserved [the victim's] demeanor as she told [the police investigator] about the sexual abuse in an interview that was held only a few days after [the victim] first reported the abuse to her camp counselor. The trial judge could reasonably conclude that, because the videotape displayed [the victim's] demeanor, the tape had substantial probative value beyond the mere words recorded on it. The trial court therefore did not abuse its discretion when it decided to allow the playing of the videotape.

*Nunn,* 845 P.2d at 440–41.

For these same reasons, we conclude that Judge Torrisi did not abuse his discretion when he decided to allow the prosecutor to play the audio tapes of C.M.'s two interviews with Kirby.

■ This bring us to the final question: whether, if the prosecutor wished to play the two taped interviews in their entirety, the prosecutor was first obliged to expressly question C.M. about each and every assertion of fact that she made in those interviews. This question is also resolved by our decision in *Nunn.*

The defendant in *Nunn* was charged with sexually abusing his stepdaughter. As in the present case, the victim was interviewed by the police and, during this interview, she described the defendant's criminal conduct; but the victim later recanted, asserting that all of her prior accusations were lies, and that these lies were motivated by her anger at the defendant.[5] After the victim repeated her recantation at trial, the State was allowed to play the videotape of the police interview.

One of Nunn's claims on appeal was that, even though the victim made inconsistent statements during the police interview, the prosecutor nevertheless failed to lay a proper foundation for playing the interview in its entirety. Nunn noted that, under Evidence Rule 613(b), a witness is normally entitled to an "opportunity, while testifying, to explain or deny any prior statement". Nunn therefore argued that the videotape could not be introduced as a whole unless the prosecutor expressly asked the victim about each and every potentially inconsistent statement contained in the interview.[6]

We rejected Nunn's argument—concluding that this suggested interpretation of Evidence Rule 613(b) was "unreasonably narrow":

> In answer to the prosecutor's questions, [the victim] testified that she had lied to [the police investigator]; she stated that Nunn had done absolutely nothing wrong. At this point, the prosecutor asked [the victim] about specific statements she had made to [the investigator] during the interview: her statement that Nunn had touched her genitals, both with his hand and with his penis, her statement that Nunn had touched her breasts and her genitals with his mouth, and her statement that Nunn had penetrated her genitals with both his finger and his penis. In each case, [the victim] recanted these statements, testifying that she had lied when she said these things to [the investigator].
>
> Under these circumstances, the trial judge could reasonably conclude that [the victim] would continue to categorically

5. *Nunn,* 845 P.2d at 439.

6. *Id.* at 441.

deny all allegations of sexual abuse and would continue to disown any and all statements she had previously made to the contrary. The trial judge could therefore conclude that [the victim] had been given sufficient opportunity to explain or deny the statements she made during her interview with [the police investigator], and that it was pointless to require the prosecutor to continue asking [the victim] about every other statement she had made during that interview.... We [therefore] uphold the trial court's ruling that the State established a proper foundation under Rule 613(b) for introducing the videotape.

*Nunn*, 845 P.2d at 441.

The same analysis applies to Active's case. C.M. had described Active's criminal conduct during her two interviews with Officer Kirby, but she later recanted her accusations, and she repeated this recantation when she was called to the stand at Active's trial. As we explained earlier in this opinion, when the prosecutor questioned C.M. at trial, she claimed to remember very little of what she had said to Kirby, but she repeatedly asserted that any accusation she had made against Active was false—that she had fabricated these accusations because she was angry at Active.

Given these circumstances, Judge Torrisi could reasonably conclude that "it was pointless to require the prosecutor to continue asking [C.M.] about every [remaining] statement she had made during [the] interview[s]". *Nunn*, 845 P.2d at 441. Accordingly, the State laid a sufficient foundation under Evidence Rule 613(b) to play the taped interviews in their entirety.

*Evidence of Active's prior conviction for second-degree sexual assault*

■ Just before Active's trial began, the prosecutor gave notice that the State intended to introduce evidence of Active's 1993 conviction for second-degree sexual assault.

Active was convicted in 1993 of second-degree sexual assault after he entered a 15–year–old girl's bedroom, held his hand over her mouth until she passed out, and then engaged in sexual activity with her. For this crime, Active received a sentence of 6 years with 2 years suspended.

Active was released from prison in January 1996, but he was put back in prison in November 1996 for violating his probation / parole. He was released again in November 1997, but in June 1999 he was sent back to prison to serve the remaining 2 years of his sentence. Thus, even though the second-degree sexual assault conviction was eleven years old at the time of Active's trial in the present case, Active had been in prison during the majority of the intervening eleven years.

The prosecutor conceded that the specific facts of the prior offense might be overly prejudicial, so he suggested that the State be allowed simply to introduce a certified copy of the judgement, telling the jury that Active had been convicted of engaging in sexual activity with a woman without her consent.

Active's attorney conceded that Active's prior conviction was potentially admissible under Alaska Evidence Rule 404(b)(3). (This rule states that when a defendant is on trial for attempted sexual assault, the government may introduce evidence of the defendant's prior convictions for sexual assault.) However, the defense attorney argued that the conviction was too old to be very probative of Active's propensity to commit sexual assault, and that therefore the proposed evidence would be more prejudicial than probative.

Judge Torrisi agreed that this evidence had "a high potential for prejudice". However, the judge agreed with the prosecutor that, given the fact that Active had been in prison for most of the intervening eleven years, the age of the conviction was not so important. The judge also concluded that, if C.M. was going to recant her accusations against Active, the State might have a significant need for the evidence.

Ultimately, Judge Torrisi told the parties that his ruling on the admissibility of this evidence would turn on what C.M. said when she was called to the stand:

> *The Court:* If [C.M.] says [that the sexual assault] did not happen, that [they] didn't even have sex, then [the] probative value [of this evidence] is outweighed by

the possibility that the jury would try the [defendant] for the [prior crime]. [But] if she says, "It did happen, and I consented", [then] I will reverse myself on this. The State has convinced me that the time period, while [ostensibly] eleven years, is really closer to something like five [years]. [And this evidence], certainly I think, is ... highly relevant under [Rule] 403.... If the victim gets [on the stand] and says, "It happened, and it was consensual", then it seems to me [that] the State has a high need for this evidence, and I will allow it.

As explained earlier in this opinion, C.M. testified that she and Active engaged in consensual sex on the night in question—*i.e.,* that their sexual activity was not an assault. Thus, at the end of the State's case-in-chief, Judge Torrisi allowed the prosecutor to introduce certified copies of (1) the information charging Active with second-degree sexual assault for engaging in sexual contact with a woman without her consent, and (2) the judgement of conviction entered against Active for that offense.

Judge Torrisi offered the defense attorney an opportunity to submit a jury instruction regarding the proper and improper uses of this evidence, but the defense attorney apparently never responded to this invitation. Judge Torrisi *sua sponte* instructed the jury that, even though evidence of Active's other crime had been admitted,

> this evidence is ... insufficient by itself to warrant [a] conviction. The State has the burden to prove each element of its case beyond a reasonable doubt. How much weight you give to the prior conviction, as with all evidence, is up to you.

On appeal, Active challenges the judge's ruling regarding the admissibility of his 1993 conviction. This challenge is meritless. The record shows that Judge Torrisi conscientiously applied the balancing test we described in *Bingaman v. State,* 76 P.3d 398, 414–16 (Alaska App.2003). The judge did

not abuse his discretion when he allowed the State to introduce evidence of the 1993 conviction.

*Active's argument that he was sentenced in violation of the Sixth Amendment right to jury trial as interpreted in Blakely v. Washington*

Active was convicted of first-degree burglary, attempted first-degree sexual assault, and two counts of fourth-degree assault. Two of these crimes—first-degree burglary and attempted first-degree sexual assault—were governed by Alaska's presumptive sentencing law (in its pre-March 2005 version). As a third felony offender, Active faced a presumptive term of 6 years' imprisonment for the burglary and 15 years' imprisonment for the attempted sexual assault.[7]

In order to authorize sentences above these presumptive terms, the State proposed four aggravating factors under AS 12.55.155(c). Judge Torrisi concluded that the State had proved three of these aggravators: (c)(8)—that Active's criminal history included aggravated or repeated instances of assaultive behavior; (c)(18)(A)—that Active's crimes were committed against someone living in the same dwelling unit; and (c)(18)(B)—that Active had committed a previous sexual assault.

These aggravators became moot with respect to Active's sentence for first-degree burglary, because Judge Torrisi imposed the unadjusted 6–year presumptive term for this crime. However, Judge Torrisi added 2 years of suspended imprisonment to the 15–year presumptive term for attempted first-degree sexual assault. (That is, he sentenced Active to 17 years with 2 years suspended.) This sentence would not be lawful in the absence of aggravating factors.

■ On appeal, Active contends that Judge Torrisi, by finding the three aggrava-

---

7. *See* AS 11.46.300(b) (first-degree burglary is a class B felony); AS 11.41.410(b) (first-degree sexual assault is an unclassified felony); AS 11.31.100(d)(2) (an attempt to commit any unclassified felony other than first-degree murder is a class A felony). *And see* former AS 12.55.125(d)(2) (pre-March 2005 version) (the presumptive term for a third felony offender convicted of a class B felony was 6 years' imprisonment); former AS 12.55.125(c)(4) (pre-March 2005 version) (the presumptive term for a third felony offender convicted of a class A felony was 15 years' imprisonment).

tors without submitting them to a jury, violated Active's Sixth Amendment right to jury trial as interpreted in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Active's first hurdle is that this claim was not preserved for appeal.

Active's sentencing took place in mid-November 2004. This was approximately five months after the United States Supreme Court issued its decision in *Blakely.* At the beginning of Active's sentencing hearing, the defense attorney took note of the *Blakely* decision. However, the defense attorney then declared that, "looking at ... the facts of Mr. Active's case, [he] would concede the [State's proposed] aggravators[.]"

The defense attorney added that he "would simply give notice" of his position that "whatever is [ultimately] decided [by the appellate courts] in terms of Alaska's presumptive sentencing statute should apply to [Active's] case". This statement did not constitute a legally adequate objection to Judge Torrisi's decision to resolve the proposed aggravators without submitting them to a jury.

Alaska Criminal Rule 46 sets forth the minimum requirements for an objection. Under this rule, "at the time the ruling ... of the court is made or sought", the attorney must "make[ ] known to the court the action which the [attorney] desires the court to take[,] or the [attorney's] objection to the action of the court[,] and the grounds therefor[.]"

Even though Active's attorney was aware of the decision in *Blakely,* the defense attorney did not ask Judge Torrisi to submit the State's proposed aggravators to a jury. Nor did the defense attorney suggest that Judge Torrisi needed to alter any other sentencing procedure on account of *Blakely.* Rather, the defense attorney announced an open-ended, unspecified objection to all aspects of the sentencing proceeding if later appellate decisions showed or indicated that one or more aspects of the proceeding were flawed.

Such a statement does not satisfy either of Criminal Rule 46's commands. The defense attorney did not expressly inform Judge Torrisi of the action that the attorney wished the judge to take (or refrain from taking), and the defense attorney did not inform Judge Torrisi of the legal grounds for the attorney's position. This means that Active must now show plain error if he is to prevail on his *Blakely* claim.

■ We have previously held that, consistent with *Blakely,* a sentencing judge can decide aggravator (c)(8) without submitting the issue to a jury if the State's proof rests solely on the defendant's criminal convictions for assaultive behavior. *Milligrock v. State,* 118 P.3d 11, 15–16 (Alaska App.2005). That was the case here; Judge Torrisi found aggravator (c)(8) based on the fact that Active had several prior convictions for assault, sexual assault, and robbery. Thus, Judge Torrisi committed no error under *Blakely* when he decided aggravator (c)(8) without submitting this issue to a jury.

For the same reason, Judge Torrisi could decide aggravator (c)(18)(B) without submitting the issue to a jury. The State's proof of this aggravator was based solely on Active's 1993 conviction for second-degree sexual assault.

Active notes that our decision in *Milligrock* rests on the fact that the *Blakely* right to jury trial does not extend to aggravating factors that are based on a defendant's prior convictions. Active asks us to declare that this exception for prior convictions does not exist under Alaska law—and that, therefore, Judge Torrisi violated the right to jury trial guaranteed by the Alaska Constitution when he decided aggravators (c)(8) and (c)(18)(B).

Active's argument ultimately rests on an expansive interpretation of the Alaska Supreme Court's decision in *Donlun v. State,* 527 P.2d 472 (Alaska 1974). According to Active, *Donlun* stands for the proposition that, when a defendant is subject to presumptive sentencing, aggravating factors must be pleaded in the grand jury indictment and must be proved to the trial jury beyond a reasonable doubt. We recently rejected this interpretation of *Donlun. See State v. Dague,* 143 P.3d 988, 994–98 (Alaska App. 2006).

In fact, in *State v. Malloy,* 46 P.3d 949 (Alaska 2002), the Alaska Supreme Court itself rejected the notion that *Donlun* re-

quired the State to allege aggravating factors in the indictment and ultimately prove these factors to a jury. The supreme court stated: "*Donlun* ... recognize[s] that an increased sentence resulting from a finding of statutory aggravating circumstances is not a harsher maximum sentence [—and thus does not trigger a right to jury trial under *Donlun*]." *Malloy*, 46 P.3d at 955.

Accordingly, we reject Active's argument that the Alaska Constitution guarantees him a broader right to jury trial with respect to sentencing factors than the right to jury trial recognized in *Blakely*.

■ This leaves aggravator (c)(18)(A). We have held that even though this aggravator should be submitted to a jury under *Blakely*, any error in not submitting this issue to a jury is harmless beyond a reasonable doubt (and thus does not constitute "plain error") if the evidence on this point is not subject to reasonable dispute—that is, if there is no reasonable possibility that a jury would have found in the defendant's favor if the issue had been submitted to a jury. *Milligrock*, 118 P.3d at 17.

Active has never claimed (either at his sentencing hearing, or in his briefs to this Court) that there was any reasonable possibility that a jury would have decided aggravator (c)(18)(A) in his favor. Thus, he has failed to allege the ingredient necessary for a claim of plain error regarding this aggravator.

*Conclusion*

The judgement of the superior court is AFFIRMED.