NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>Pacific</u> <u>Reporter</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| ROBERT JAMES LUCH, | Court of Appeals No. A-11756 |
| Appellant, | Trial Court No. 3AN-10-11122 CR |
| v. | |
| STATE OF ALASKA, | O P I N I O N |
| Appellee. | No. 2586 — January 19, 2018 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Jack W. Smith, Judge.

Appearances: Phillip Paul Weidner and A. Cristina Weidner Tafs, Weidner & Associates, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

Robert James Luch was convicted of first-degree murder for shooting and killing his wife, Jocelyn. In this appeal, Luch argues that the trial judge committed error

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

by failing to instruct the jury on the defense of heat of passion. Luch also contends that the trial judge made several erroneous evidentiary rulings at his trial.

For the reasons explained in this opinion, we conclude that none of Luch's claims have merit, and we therefore affirm his conviction.

*Underlying facts*

In the summer of 2010, Robert Luch and his family — his wife Jocelyn and their four children (Brent, Delia, Letitia, and Marcelyn) — moved back to Anchorage from their winter home in Arizona. One night in June, Luch awakened and noticed that the telephone was in use. When he picked up the receiver, Luch discovered that his wife Jocelyn was speaking with a man — Bryan Fuqua. Luch exchanged words with Fuqua. During their short but heated conversation, Fuqua indicated that his relationship with Jocelyn either was, or would shortly become, sexual. After hearing this, Luch hung up the phone. He woke up the children, and he angrily accused Jocelyn of having an affair.

During the next several months, the family lived in a state of uneasy tension. Luch and Jocelyn spoke little, and Jocelyn began staying out late, sometimes not coming home until the following day. The couple's daughter Marcelyn later told the police that, during this period, Luch repeatedly threatened to kill both Jocelyn and the man he believed she was seeing.

In August, two of the Luchs' children (Delia and Letitia) moved back to Arizona to attend college. This left four people in the Anchorage household: Luch, Jocelyn, and their children Marcelyn and Brent.

On September 17, 2010, Luch purchased a handgun, purportedly for protection at the family cabin near Sutton. Luch did not inform Jocelyn of this purchase; the only other family member who knew about the gun was Luch's son Brent.

Eleven days later, on the morning of September 28, 2010, Luch learned that a car he had loaned to his daughter Delia had been impounded in Arizona. Luch was incensed, and he began yelling at Delia on the telephone. Brent overheard this conversation and tried to calm things down, but Luch turned on Brent, and a fist fight ensued. Luch's daughter Marcelyn eventually intervened and stopped the fight, but Luch was still angry.

Luch then drove to the hotel where his wife Jocelyn worked and tried to see her, purportedly so that he could tell her about the impoundment of Delia's car and his fight with Brent. When Jocelyn could not leave her work station immediately, Luch parked his vehicle behind the hotel and waited for several hours, becoming angrier as time passed. Eventually, Luch drove home without Jocelyn, and Brent and Marcelyn later picked Jocelyn up.

That same night, Marcelyn and Jocelyn were scheduled to run in a race held at Kincaid Park. A friend of Jocelyn's, a runner named Steve Crook, came to pick them up. At the last minute, Marcelyn decided not to go.

When Luch learned that Marcelyn had not accompanied Jocelyn to the race, he insisted that Marcelyn go with him to Kincaid Park to confirm that Jocelyn was actually at the race. At the park, they stood near the finish line and watched as hundreds of racers crossed the finish line, but they did not see Jocelyn.

Once the race was over, Marcelyn called Jocelyn on her cell phone. Jocelyn said that she was at a nearby bunker. (Kincaid Park was built on the site of a former missile installation.) Marcelyn suggested to Luch that he drive to the bunker while she walked over there and found Jocelyn. But as Marcelyn was walking toward the bunker, Jocelyn spoke to her again on the phone: Jocelyn corrected herself and said that she was not at the bunker, but rather at the adjacent Kincaid chalet. Marcelyn was

unable to inform Luch of this new information because she (Marcelyn) had his cell phone.

Marcelyn went to the chalet and found her mother, but Luch did not arrive to pick them up. Luch had apparently driven around the Kincaid parking lot, honking repeatedly and becoming increasingly agitated, until finally he drove home alone.

When Jocelyn and Marcelyn realized that Luch was not coming for them, Marcelyn called her brother Brent, who came and picked them up.

When Jocelyn and the children arrived home, Luch was sitting in his recliner in the downstairs living room. He repeatedly accused Jocelyn of not having run the race.

Brent and Marcelyn soon went to their bedrooms upstairs. Jocelyn also went upstairs and began preparing for bed. Luch came upstairs and confronted her — accusing her of lying about participating in the race, and accusing her of seeing another man. Jocelyn assured Luch that she had been at the race, and she denied any wrongdoing, but Luch was not convinced. He went downstairs to the garage, where he retrieved the newly purchased handgun from a locked storage room. He then went back upstairs.

According to Luch's testimony at trial, he did not retrieve the gun with the intent of harming his wife. Rather, Luch told the jury that he intended to use the gun "to posture, to stage." Luch testified that, by simply displaying the gun to Jocelyn, he hoped to convince her that he was willing to shoot any man she was seeing, so that she would then "relay a message" to this man.

By the time Luch returned upstairs, Jocelyn had gone into the bathroom. Luch followed her there. Shortly thereafter, Marcelyn heard Jocelyn say, "Don't push me" — and then she heard two gunshots. Marcelyn and Brent rushed into the hallway,

and Marcelyn saw Luch leave the bathroom and go downstairs carrying the handgun. Luch said nothing to his children.

The children had to force their way into the bathroom because Jocelyn's body was blocking the door. Jocelyn was still alive, but she was bleeding from two gunshot wounds. Brent located Jocelyn's cell phone and called 911.

The police arrived within minutes. Anchorage Police Officer Mark Bakken entered the house and stayed with Jocelyn until an ambulance arrived. During that brief conversation, Jocelyn told the officer that Luch had shot her because she wanted to divorce him and she refused to return to Arizona with him.

While this was happening, Luch took the handgun back to the storage room of the garage, and he then left the house. The police found Luch walking down the street. Luch told them, "I'm the one you want."

Jocelyn was taken to the hospital, but she died from her wounds. Luch was indicted for this homicide under alternative theories of first- and second-degree murder.

*Luch's claim that he was entitled to a jury instruction on the defense of heat of passion*

Luch contends that the trial judge committed error by rejecting his attorney's request for a jury instruction on the defense of "heat of passion". We will first describe the law in Alaska regarding heat of passion, and then we will explain why Luch was not entitled to a jury instruction on this defense.

*(a) Explanation of the defense of heat of passion under Alaska law*

The defense of heat of passion is defined in AS 11.41.115. This statute declares that heat of passion is a partial defense to two types of murder:

- a homicide charged under AS 11.41.100(a)(1)(A) — *i.e.*, an intentional killing that would otherwise be first-degree murder, or

- a homicide charged under AS 11.41.110(a)(1) — *i.e.*, a killing that would otherwise be second-degree murder because it resulted from an assault where the defendant intended to inflict serious physical injury, or where the defendant knew that the assault was substantially certain to cause death or serious physical injury.

The defense of heat of passion applies to instances where the defendant "acted in a heat of passion ... result[ing] from a serious provocation by the intended victim", and where the defendant assaulted the victim "before there [was] a reasonable opportunity for the passion to cool". AS 11.41.115(a).

For purposes of the heat of passion defense, the term "serious provocation" is defined to mean "conduct ... sufficient to excite an intense passion in a reasonable [and unintoxicated] person in the defendant's situation, ... under the circumstances as the defendant reasonably believed them to be". AS 11.41.115(f)(2). However, the statute limits the scope of "serious provocation" by adding that "insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim do not, alone or in combination with each other, constitute serious provocation." *Ibid.*

Although heat of passion is a defense to first-degree murder charged under AS 11.41.100(a)(1)(A) or second-degree murder charged under AS 11.41.110(a)(1), it is only a partial defense. Heat of passion does not exonerate the defendant; instead, it reduces the crime to manslaughter. *See* AS 11.41.115(e).

Moreover, because the heat of passion statute declares that this defense applies only to charges of first-degree murder under AS 11.41.100(a)(1)(A) and charges of second-degree murder under AS 11.41.110(a)(1), Luch could only claim heat of passion with respect to one of the murder charges against him.

– 6 –

2586

Luch was indicted for first-degree murder under AS 11.41.100(a)(1)(A), so the heat of passion defense potentially applied to that charge. But Luch was indicted for second-degree murder, not under AS 11.41.110(a)(1), but rather under AS 11.41.110(a)(2) — *i.e.*, causing Jocelyn's death while engaging in conduct manifesting an extreme indifference to the value of human life. The defense of heat of passion does not apply to charges under this subsection of the second-degree murder statute.

### (b) There was insufficient evidence that Luch was subjected to a "serious provocation" within the meaning of the heat of passion statute

A defendant is entitled to have the jury instructed on a defense if the defendant presents "some evidence" of that defense. In this context, the phrase "some evidence" is a term of art. It means evidence which, if viewed in the light most favorable to the defendant, is sufficient to allow a reasonable juror to find in the defendant's favor on every element of the defense. [1]

As we explained in the preceding section of this opinion, the elements of the defense of heat of passion are (1) that Luch shot his wife "in a heat of passion", (2) that this passion was the result of a "serious provocation" (as that phrase is defined in the statute), and (3) that Luch shot his wife before there was a reasonable opportunity for his passion to cool.

Even when the evidence in this case is viewed in the light most favorable to Luch's proposed defense, there was insufficient evidence that Luch was subjected to a "serious provocation".

---

[1]  *Dandova v. State*, 72 P.3d 325, 332 (Alaska App. 2003); *Lacey v. State*, 54 P.3d 304, 308 (Alaska App. 2002).

The governing statute, AS 11.41.115(f)(2), defines "serious provocation" as "conduct ... sufficient to excite an intense passion in a reasonable [and unintoxicated] person in the defendant's situation, ... under the circumstances as the defendant reasonably believed them to be". Here, the alleged "serious provocation" was the purported fact that Luch's wife was having an affair.

As we explained earlier in this opinion, there was evidence that, *several months before the shooting*, Luch learned that his wife might have been having an affair — in particular, the testimony about the overheard phone call, and about Jocelyn's refusal to explain why she was spending several nights a week away from the marital home.

But in Luch's trial testimony, he conceded that his relationship with his wife was significantly better in the two months immediately preceding the shooting. And there was no evidence that Luch knew or even reasonably believed at the time of the shooting that Jocelyn was having an affair. There was plenty of evidence that Luch *suspected* that his wife was having an affair at that time, but even Luch conceded in his trial testimony that he did not know whether his suspicions were well-founded.

At trial, Luch's attorney asked him whether his suspicions intensified on the day of the killing (September 28, 2010), after Luch went to pick up Jocelyn from work and ultimately left without her. Luch's attorney asked him, "At [that] point, are you thinking she's cheating?", Luch responded:

> Possibly. I — I don't want to believe that. I want to trust my wife very badly. ... I want to believe the best scenario, so I'm trying to resist going that direction in my thought. But there's, of course, there's a, there's some doubts. I'm not sure.

Later that day, after the incident in Kincaid Park where Luch was unable to locate Jocelyn at the race, Luch was waiting at home when Jocelyn and the children (Marcelyn and Brent) arrived home from Kincaid Park. According to Luch, he was "festering" because he strongly suspected that his wife had not run the race at Kincaid Park — that she was "off on another tryst". But Luch added that he was not sure about this. He explained that he was "trying to hold it all together" because "there might be something [he was] not aware of" — for instance, the possibility of "a mechanical breakdown", or a "different finish line" to the race.

When Jocelyn got home, Luch repeatedly accused her of not having run in the race. But Jocelyn did not respond to these accusations; instead, she went upstairs after a few minutes and started preparing for bed. Luch followed her upstairs and confronted her — accusing her of lying about participating in the race, and accusing her of seeing another man. Jocelyn assured Luch that she *had* been at the race, and she denied any wrongdoing, but Luch was not convinced. At that point, Luch went to the garage, obtained the handgun, and returned to his wife's bathroom.

At common law, one classic example of "serious provocation" was the defendant's discovery of their spouse's adultery.[2] However, the common law required that the defendant find their spouse *in flagrante delicto* — that is, in the very act of committing adultery.[3] Reflecting this principle, Alaska's statutory definition of "serious provocation", AS 11.41.115(f)(2), expressly declares that a "serious provocation" cannot be based on hearsay reports.

---

[2] *Dandova v. State*, 72 P.3d 325, 336 (Alaska App. 2003); *Martin v. State*, 664 P.2d 612, 617 (Alaska App. 1983).

[3] Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd ed. 1982), pp. 96-97.

Thus, when a defendant claims that they committed a deadly assault in response to a discovery of adultery, that "discovery" must be based on the defendant's personal knowledge, and not the defendant's suspicions or conclusions based on hearsay accounts (which are expressly excluded by the statute).

The fact that, several months before the shooting, Luch may have had good reason to believe that Jocelyn was having an affair does not mean that Luch was experiencing a "serious provocation" when, on the day of the race, he could not find Jocelyn where he expected her to be. Luch never claimed that he had personal knowledge of his wife's adultery, and there was no evidence that Jocelyn admitted adultery to him. In fact, the evidence was that Jocelyn denied any wrongdoing when Luch confronted her on the day of the killing.

Nor was there evidence that Luch *reasonably believed* that Jocelyn was committing adultery. Although Luch repeatedly expressed suspicions that his wife was having an affair, he conceded on the stand that his doubts about his wife's fidelity were unconfirmed, and that he knew there were other potential explanations for his failure to see Jocelyn at the finish line of the race at Kincaid Park.

We therefore hold that Luch failed to present some evidence that he was subjected to a "serious provocation" as that term is defined in AS 11.41.115(f)(2). Because of this, we affirm the trial judge's decision not to instruct the jury on the defense of heat of passion.

*Luch's contention that the trial judge committed error by allowing the prosecutor to introduce evidence of Jocelyn's statements to a police officer soon after the shooting*

Shortly after the Luch children entered their parents' bedroom and discovered that Jocelyn had been shot, they called 911. Anchorage Police Officer Mark Bakken responded to the 911 call.

Officer Bakken found Jocelyn lying on the bathroom floor in a fetal position, clutching her stomach. He confirmed that Jocelyn had been shot, and he testified that she was in pain and scared. According to Bakken, Jocelyn repeatedly asked him for help, and she expressed her belief that she was "not going to make it."

Bakken radioed for medical assistance, and he waited with Jocelyn until the paramedics arrived, holding her hand to give her emotional support. While they were waiting for the paramedics, Officer Bakken asked Jocelyn about her physical condition and how she had sustained her injuries. The audio recording of this conversation was introduced by the State at Luch's trial.

*(a) The content of Jocelyn's out-of-court statements, and the trial judge's rulings*

Jocelyn told Officer Bakken that she and her husband were getting divorced, that her husband had threatened to kill her, and that he had shot her twice. Regarding her physical condition, Jocelyn told Officer Bakken that she was in pain and that she "[couldn't] make it any longer." Here is a transcription of Jocelyn's statements to Officer Bakken about the shooting:

> *Jocelyn Luch*: Please help me.
>
> *Officer Bakken*: Okay, hold on, we're ...

*Jocelyn*:  Please help me.

*Officer Bakken*:  Who shot you?

*Jocelyn*:  My husband.

*Officer Bakken*:  Okay.  26C, go ahead and send medics in red.

*Jocelyn*:  Help me.  Please help me.  [He is outside killing himself.]  (Initially transcribed as indiscernible.)

*Officer Bakken*:  Okay, we got him right now.  What's his name?

*Jocelyn*:  Robert Luch.  (Indiscernible).

*Officer Bakken*: She's saying — she's confirmed the suspect is Robert, [her] husband Robert.  We have him (indiscernible).

*Jocelyn*:  Please help me.

*Officer Bakken*:  Okay, (indiscernible).  What's your name?

*Jocelyn*:  Please help me.

*Officer Bakken*:  What's your name?

*Jocelyn*:  Jocelyn Luch.

*Officer Bakken*:  What is it?

*Jocelyn*:  Jocelyn Luch.

*Officer Bakken*:  Jocelyn.  Okay; the medics are coming in, the information (indiscernible).

*Jocelyn*:  Please help me.  Please help me.

*Officer Bakken*:  I know, we're coming.  I promise you, they're (indiscernible) waiting for us.  We've got him too, okay?

*Jocelyn*:  Please help me.

*Officer Bakken*:  Why did he shoot you?

*Jocelyn*:  We're getting a divorce.

*Officer Bakken*:  Okay.

*Jocelyn*:  Please help me.

*Officer Bakken*:  Okay, sweetie.  I got you.

*Jocelyn*:  Please.

*Officer Bakken*:  I got your hand.

*Jocelyn*:  It hurts.

*Officer Bakken*: Where does it — how many times did you get shot?

*Jocelyn*:  Two times.

*Officer Bakken*:  Twice?  Where at?  Both in the ...

*Jocelyn*:  In my stomach.  Please help me.

*Officer Bakken*: 26, we got two gunshot wounds in the stomach. She is still apparently conscious and aware.

*Jocelyn*: (Indiscernible.)

*Officer Bakken*: I got you.

*Jocelyn*: He said he's going to kill me.

*Officer Bakken*: We've got — he's not going to kill you, I promise you. We've got him, so you're safe.

*Jocelyn*: [Because I am not going with him to Arizona.] (Initially transcribed as indiscernible.)

*Officer Bakken*: I'm not. I'm right here with you.

*Jocelyn*: [Please help me.] (Initially transcribed as indiscernible.) Please, can you call my friend Carol?

*Officer Bakken*: ... We're going to take care of that, okay?

*Jocelyn*: (Indiscernible), can't make it any longer.

*Officer Bakken*: Okay, they're coming; they just pulled up. Paramedics. We're upstairs. Upstairs.

*Jocelyn*: (Indiscernible) to breathe. (Indiscernible.)

*Officer Bakken*: She's conscious and aware, but she's been shot twice in the stomach.

*Jocelyn*: One in my shoulder.

*Officer Bakken*:  And one in the shoulder, okay.

Two days later, on September 30th, Jocelyn died in the hospital as a result of the gunshot wound to her abdomen.

Before trial, the State filed a motion seeking permission to introduce Jocelyn's statements to Officer Bakken, arguing that Jocelyn's statements constituted a dying declaration as defined in Alaska Evidence Rule 804(b)(2).  This evidence rule authorizes the admission of a person's out-of-court statement if the person is unavailable as a witness, if the person made the statement "while believing that [their] death was imminent", and if the statement "concern[s] the cause or circumstances of what the [person] believed to be impending death."

To resolve this issue, the trial court held an evidentiary hearing at which Officer Bakken testified.  Based on Bakken's testimony and the audio recording of the statements, the trial judge found that Jocelyn's statements were admissible as a dying declaration.  The judge noted the severity of Jocelyn's injuries, as well as Officer Bakken's testimony that Jocelyn was "terrified" and that she believed she was dying. The judge also relied on the fact that, toward the end of the audio recording, Jocelyn can be heard saying that she needed the ambulance to arrive quickly "because she cannot make it anymore".

The trial judge also found that Jocelyn's statements were independently admissible as excited utterances as defined in Alaska Evidence Rule 803(2).  Under this evidence rule, an out-of-court statement is admissible if it "relat[es] to a startling event or condition" and if it was "made while the [speaker] was under the stress of excitement caused by the event or condition."

*(b) Luch's argument that Jocelyn's statements did not qualify as a dying declaration*

On appeal, Luch argues that Jocelyn's statements to the officer were not admissible as a dying declaration. In particular, Luch argues that Jocelyn did not make these statements while believing that her death was imminent.

In *Johnson v. State*, 579 P.2d 20 (Alaska 1978), the Alaska Supreme Court clarified the requirement that the speaker believe that their death is imminent:

> We believe that to require that the declarant have abandoned all hope of recovery is overly demanding. In light of modern medical science it is rare indeed that all hope of recovery is abandoned, yet a victim may be aware of the probability that his death is impending to the extent necessary to create sufficient solemnity to give adequate assurance of the trustworthiness of his testimony. What is required for a dying declaration to be admissible is that the declarant have such a belief that he is facing death as to remove ordinary worldly motives for misstatement. In that regard, the court may consider the totality of the circumstances including the presence or absence of motive to falsify and the manner in which the statement was volunteered or elicited.

*Johnson*, 579 P.2d at 25.

Under this test, the question of Jocelyn's state of mind when she made the statements to Officer Bakken is a question of historical fact — and we must uphold a trial court's findings of historical fact unless those findings are clearly erroneous. [4] Having

---

[4] *See Sipary v. State*, 91 P.3d 296, 305-06 (Alaska App. 2004) (holding that it is a question of fact whether a speaker had the state of mind that is required for their out-of-court statement to qualify as an "excited utterance" under Evidence Rule 803(2) — and that, for this reason, an appellate court "will uphold the trial judge's conclusion on this issue unless

(continued...)

reviewed the record, we conclude that the trial judge's finding on this issue is not clearly erroneous.

Luch argues in the alternative that several of Jocelyn's statements to the officer did not concern the "cause or circumstances" of Jocelyn's impending death. Luch asserts that this phrase encompasses only Jocelyn's statements that directly describe the actual shooting and her resulting wounds — not Jocelyn's statements describing the events leading up to the shooting, or describing her husband's motive for shooting her, or describing the events immediately attending the shooting (such as Jocelyn's assertion that, while she was speaking to the officer, she believed that Luch was "outside killing himself").

We conclude that Luch's proposed interpretation of the phrase "cause or circumstances" is too narrow. As *McCormick on Evidence* explains, this phrase is meant to codify the rule that the out-of-court statements are admissible only to the extent that they relate "to the circumstances of the killing and to the events more or less nearly preceding it in time and leading up to it":

> Under this [limitation], declarations about previous quarrels between the accused and the victim would be excluded, while transactions between them leading up to and shortly before the present attack would be received. Some limitation as to time and circumstances is appropriate to enhance trustworthiness, but proper phrasing is difficult. ... Statements identifying an attacker are clearly admissible under [the "cause or circumstances" limitation], and those [statements] describing prior threats by, or fights and argument with, such person also meet its requirements.

---

[4] (...continued)
that conclusion is shown to be clearly erroneous.").

Kenneth S. Broun *et alia*, *McCormick on Evidence* (7th ed. 2013), § 311, Vol. 2, p. 516.

This same approach is echoed in Dean Wigmore's classic treatise on the law of evidence: John Henry Wigmore, *Evidence in Trials at Common Law* (Chadbourn revision, 1974).

As explained in *Wigmore*, a dying declaration "must concern the *facts leading up to or causing or attending* the injurious act which has resulted in the declarant's death". *Id.*, § 1434, Vol. V, p. 282 (emphasis in the original). (See also the many cases collected in accompanying footnote 1.) *Wigmore* acknowledges that this limitation provides "opportunity for prolific quibbling", *id.* at 284, but the treatise suggests that the rule should be applied in a common-sense manner.

When we apply these principles to Luch's case, we conclude that Jocelyn's out-of-court statements to Officer Bakken concerned the "cause or circumstances" of what she believed to be her impending death.

Accordingly, we conclude that the trial judge properly characterized Jocelyn's statements as a dying declaration under Evidence Rule 804(b)(2).

### (c) Luch's argument that Jocelyn's statements did not qualify as excited utterances

Luch also challenges the trial judge's alternative ruling that Jocelyn's statements qualified as excited utterances under Evidence Rule 803(2).

Luch notes that the prosecutor did not argue this theory of admissibility in his motion, and that the trial judge apparently reached this conclusion independently, after hearing Officer Bakken's testimony and reviewing the statements. Luch notes in passing that the judge made this ruling "without allowing the defense to address the issue", but Luch does not ask this Court to remand his case to the trial court so that he can present further evidence on this issue.

Instead, Luch takes the position that Jocelyn's statements could not qualify as excited utterances because they were made in response to Officer Bakken's questions. Luch contends that any statement made in response to police questioning must be the product of reflection — and therefore cannot qualify as an excited utterance.

This is not the law in Alaska. In both *Charles v. State*, 780 P.2d 377, 382 (Alaska App. 1989), and *Anderson v. State*, 163 P.3d 1000, 1001 (Alaska App. 2007), this Court upheld trial court rulings that out-of-court statements qualified as excited utterances even though the statements were made in response to questions by a 911 dispatcher and by police officers who were attempting to find out what had happened.

Luch's case is analogous to *Charles* and *Anderson*. After Officer Bakken arrived on the scene and confirmed that Jocelyn had been shot, he asked her a series of open-ended questions designed to clarify what had happened. Both the content and the circumstances of Jocelyn's responses — the nature of her wounds, her repeated pleas for help, and her assertion that she did not think she could "make it much longer" — all support the trial judge's conclusion that these statements were excited utterances under Evidence Rule 803(2).

It is a question of fact whether a speaker had the state of mind that is required for their out-of-court statement to qualify as an "excited utterance" under Evidence Rule 803(2).[5] For this reason, an appellate court "will uphold the trial judge's conclusion on this issue unless that conclusion is shown to be clearly erroneous."[6] In Luch's case, the trial judge's conclusion is not clearly erroneous, and we therefore uphold the trial judge's ruling.

---

[5]  *Sipary v. State*, 91 P.3d 296, 305-06 (Alaska App. 2004).

[6]  *Ibid.*

*(d)   Luch's argument that the admission of Jocelyn's statements
violated his right of confrontation under the Sixth Amendment*

Finally, Luch argues that even if Jocelyn's statements to Officer Bakken were admissible under the hearsay exceptions for excited utterances or a dying declaration, the admission of these statements nevertheless violated his right of confrontation under the Sixth Amendment as construed in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  (In *Crawford*, the Supreme Court held that the confrontation clause bars the introduction of "testimonial" hearsay against a criminal defendant unless the defendant had an earlier adequate opportunity to cross-examine the speaker.)

We reject Luch's confrontation clause argument for two reasons.

First, because we have upheld the trial court's ruling that Jocelyn's statements to Officer Bakken were excited utterances, Luch's position is at odds with this Court's decision in *Anderson v. State*, 163 P.3d 1000 (Alaska App. 2007).  In *Anderson*, we held that an injured crime victim's statements to a police officer were not "testimonial" for confrontation clause purposes when the primary purpose of the officer's questions "was to sort out an ongoing emergency situation rather than to investigate a past crime",[7] and when the crime victim's answers "[were] relevant to communicate or explain the nature and extent of [their] current injuries."[8]

Second, viewing Jocelyn's statements to Officer Bakken as a dying declaration, we conclude that Luch's case is governed by the United States Supreme Court's decision in *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 79 L.Ed.2d 93 (2011).  In *Bryant*, the Supreme Court held that a mortally wounded shooting victim's

---

[7]   *Anderson*, 163 P.3d at 1004.

[8]   *Id*. at 1005.

responses to on-the-scene questioning by a police officer were not testimonial for purposes of the confrontation clause.

The Supreme Court relied on the fact that the primary purpose of the officer's inquiries was to enable police and medical responders to meet the ongoing emergency by finding out what had happened (*id.*, U.S. at 374-76, S.Ct. at 1165-66) — "the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible [continuing] danger to the ... victim and to the public". *Id.*, U.S. at 376, S.Ct. at 1166.

The Supreme Court also relied on the mental state of the shooting victim:

> When he made the statements, [the victim] was lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen. His answers to the police officers' questions were punctuated with questions about when emergency medical services would arrive. ... He was obviously in considerable pain and had difficulty breathing and talking. … From this description of his condition and report of his statements, we cannot say that a person in [the victim's] situation would have had a "primary purpose" to establish or prove past events potentially relevant to later criminal prosecution.

*Bryant*, 562 U.S. at 375, 131 S.Ct. at 1165.

Finally, the Supreme Court considered "the informality of the situation and the interrogation":

> [This] informality suggests that the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the victim] to[,] or focused him on[,] the possible future prosecutorial use of his statements.

2586

*Bryant*, 562 U.S. at 377, 131 S.Ct. at 1166.

Based on these facts, the Supreme Court ruled that the victim's statements to the police were not testimonial hearsay — and, thus, the confrontation clause did not bar the admission of these statements. *Id.*, U.S. at 378, S.Ct. at 1167.

We reach the same conclusion here.

### (e) Luch's argument that the admission of Jocelyn's statements violated his right of confrontation under the Alaska Constitution

Luch argues that even if the admission of Jocelyn's statements did not violate the confrontation clause of the federal constitution, we should hold that the admission of these statements violated the confrontation clause of our state constitution (Article I, Section 11).

But Luch's argument of this point is cursory: it consists of two conclusory sentences, without citation to any legal authority. As this Court has repeatedly stated, a provision of the Alaska Constitution will not be interpreted to provide greater protection than a corresponding provision of the federal constitution unless there is "something in the text, context, or history of the Alaska Constitution" to justify this divergent interpretation. [9]

We therefore reject Luch's argument that the confrontation clause of the Alaska constitution barred the admission of Jocelyn's statements to the officer.

---

[9] *See, e.g., Shorty v. State*, 214 P.3d 374, 379 (Alaska App. 2009); *Harris v. State*, 195 P.3d 161, 181 (Alaska App. 2008); *Aaron v. Ketchikan*, 927 P.2d 335, 336 (Alaska App. 1996); *State v. Zerkel*, 900 P.2d 744, 758 n. 8 (Alaska App. 1995).

*(f)  Our conclusion on this issue*

For the reasons explained here, we conclude that Jocelyn Luch's statements to Officer Bakken were properly admitted at Luch's trial.

*Luch's argument that the State failed to establish a proper foundation for admitting evidence of Marcelyn Luch's prior inconsistent statements to the police*

When the police responded to the shooting, they found the Luchs' daughter Marcelyn at the residence, and they transported her to the police station. During the ride to the police station, Marcelyn was informally asked about what had happened, and then the police conducted a more formal interview when Marcelyn arrived at the station. Marcelyn's statements in the patrol car were audio recorded, and her interview at the station was video recorded.

Marcelyn told the police that her father had been planning to murder her mother. She said that Luch had talked about this plan eight to ten times during the summer. According to Marcelyn, Luch told her that, if he killed Jocelyn, he would claim temporary insanity. Marcelyn urged the police not to be fooled by any claim of insanity.

Shortly before Marcelyn was called to testify at Luch's trial, the prosecutor alerted the trial judge and the defense attorney that the State intended to introduce the recordings of Marcelyn's statements to the police if Marcelyn denied making these statements, or if she claimed to have no memory of them, or if she claimed that the statements were lies.

Marcelyn took the stand later that day. When the prosecutor questioned Marcelyn about her statements to the police, she repeatedly claimed to have no memory of making those statements. Then, when the defense attorney cross-examined Marcelyn,

she declared that if she had indeed made those statements, the statements were false. On redirect, the prosecutor asked Marcelyn about this inconsistency:

> *Prosecutor*: When I was asking you questions, you said, "My dad didn't say those statements, and I never said those to the police." And then when Mr. Lambert asked you questions, you said, "I said them, but I lied." So which is it? Did you lie, or did you not say those things?

> *Marcelyn*: (Whispered conversation) I think I lied about saying those things back in the police interview.

> *Prosecutor*: Tell us about your thought process in deciding to lie about things your dad said to you.

> *Marcelyn*: What do you mean?

> *Prosecutor*: How did you decide that you were going to lie to the police that night? ... What were you thinking?

> *Marcelyn*: I — I can't really remember. I just remember [that] I didn't want to see him ever again that night.

> *Prosecutor*: Did you realize, at the time you were saying those statements, that you were lying to the police? Or did you realize it later?

> *Marcelyn*: Later.

> *Prosecutor*: When?

> *Marcelyn*: Like last week, when everyone was talking about it all.

*Prosecutor*: So you didn't realize you had lied to the police until last week?

*Marcelyn*: Yes.

*Prosecutor*: Who'd you tell? Who was the first person you told that you realized you had lied?

*Marcelyn*: Like over the weekend?

*Prosecutor*: When you realized you lied, who was the first person you told?

*Marcelyn*: I haven't really told anyone that [before].

The trial judge ruled that Marcelyn's recorded statements to the police were admissible as prior inconsistent statements. More specifically, the judge concluded that it was "essential" for the jury to know whether Marcelyn made those statements to the police, and "how she presented those statements to the officers."

On appeal, Luch challenges this ruling on two grounds.

First, Luch points out that when the prosecutor asked Marcelyn about her statements to the police, the prosecutor failed to expressly ask Marcelyn about several specific factual assertions contained in those statements. Because of this, Luch argues that the prosecutor failed to satisfy the foundational requirements of Alaska Evidence Rule 613(b) and Alaska Evidence Rule 801(d)(1)(A)(i) — that is, the requirement of examining Marcelyn in such a way as to give her the opportunity "to explain or deny" those specific statements.

Luch's argument is answered by this Court's decision in *Active v. State*, 153 P.3d 355 (Alaska App. 2007).

In *Active*, we addressed the question of whether a litigant who wishes to introduce a witness's prior inconsistent statements during police interviews "[is] obliged to expressly question [the witness] about each and every assertion of fact that [the witness] made in those interviews." *Id.* at 363. We held that Evidence Rule 801(d)(1)(A) does not require the litigant to do this if, when the witness is asked about the prior statements, the witness's answers provide a reasonable basis for the trial judge to conclude that the witness "would continue to disown any and all statements she had previously made to the contrary." *Id.* at 364.

In *Active*, the witness repeatedly asserted that she did not remember making the prior incriminatory statements — and she further asserted that, if she had indeed made those statements, they were false. *Ibid.* Given the witness's answers, we held that the trial judge could reasonably conclude that the witness had been given sufficient opportunity to explain or deny the statements she made to the police investigator, and that "it was pointless to require the prosecutor to continue asking [the witness] about every other statement she had made during that interview." [10]

We reach the same conclusion in Luch's case.

Luch argues in the alternative that even if the prosecutor met the foundational requirements of Evidence Rule 801(d)(1)(A), the trial judge nevertheless abused his discretion when he allowed the prosecutor to introduce *extrinsic* evidence (*i.e.*, recordings) of the particular statements that Marcelyn admitted making to the police.

Again, Luch's argument is answered by this Court's decision in *Active*. In *Active*, we reviewed our prior decisions on this question, and we re-affirmed the rule that even when a witness acknowledges making the prior inconsistent statement, a trial

---

[10] *Ibid.*, quoting *Nunn v. State*, 845 P.2d 435, 441 (Alaska App. 1993).

judge may allow a party to introduce extrinsic evidence of the witness's prior statement if (1) it is crucial for the jury to decide whether to credit the witness's in-court testimony as opposed to the prior inconsistent statement, and (2) the extrinsic evidence will give the jury a more complete context in which to evaluate the witness's prior statement. *Id.* at 362-63.

Stated somewhat differently, the question is whether the trial judge could reasonably conclude that the jury might view the facts differently if they heard the audio or video record of the conversation in which the witness made the prior inconsistent statements — as opposed to simply hearing the witness's unelaborated concession that they made the prior statements. *Id.* at 362.

In Luch's case, the trial judge concluded that the recordings of Marcelyn's statements to the police should be admitted because it was "essential" for the jury to hear "how she presented those statements to the officers." Given the record in this case, we conclude that the judge's ruling was not an abuse of discretion, and we therefore uphold it.

> *Luch's contention that the case against him should be dismissed because the State came into possession of (1) several pages of Luch's handwritten notes about the case, and (2) Luch's annotations and highlighting of the transcripts of Brent's and Marcelyn's statements to the police*

Toward the end of April 2012, one of the prosecutors assigned to Luch's case received a telephone call from Adrien Mercille, a prison inmate who had been housed at the same correctional facility as Luch. Mercille told the prosecutor that, in anticipation of Mercille's release from custody, Luch gave him letters to mail to Luch's sister. According to Mercille, Luch wanted him to mail these letters from outside prison so that Luch would not have to worry about corrections officers screening the letters.

The letters were contained in envelopes that were addressed in Luch's handwriting. These envelopes were addressed to Luch's daughter Letitia ("Letty") in care of Luch's sister, Elaine Shephard, residing in Sun Lakes, Arizona.

The envelopes also bore the hand-written return address of the house on Telstar Circle in Anchorage where Luch's family was residing at the time of the homicide. This was significant because all inmates are told that the Department of Corrections will not send letters for prisoners unless the letter bears their inmate number and the return address of the correctional facility where they are housed.

These letters contained several handwritten pages in which Luch described his view of the case, as well as Luch's hand-annotated transcripts of Brent's and Marcelyn's prior statements, both to the police and to the defense.

After Mercille alerted the prosecutor's office to these letters, police detectives were sent to interview Mercille and to take possession of the letters from him. Two days after that, the prosecutor sent Luch's attorney a recording of the detectives' interview with Mercille and copies of the written materials.

Luch's attorney did not respond to the recording and the written materials for more than seven months. But in early January 2013, the defense attorney filed a motion to dismiss the case against Luch, arguing that the State's possession of the letters constituted a breach of Luch's attorney-client privilege and, by extension, a denial of his right to counsel.

More specifically, Luch's attorney disputed Mercille's account of how he came into possession of the letters. Luch's attorney contended that Luch had written the letters *to his attorney*, and that Luch had never given these letters to Mercille. Rather, the defense attorney asserted, Mercille had stolen the letters.

The superior court held an evidentiary hearing to resolve this dispute. At this hearing, both Luch and Mercille testified.

Luch asserted that Mercille stole several documents from his cell in mid-April 2012 — "letters, notes, written statements, [and] discovery". According to Luch, Mercille demanded that Luch pay him $2000 for the return of these documents — and he threatened Luch that he would turn the documents over to the police if Luch did not pay the money.

Luch further testified that these written materials were never intended for his children, and that he never asked Mercille to mail these materials to his children, or to anyone else. Instead, Luch said, he intended to turn these materials over to his attorney at some future time when his attorney visited him in jail.

For his part, Mercille testified that Luch approached him and asked if he would mail some letters for Luch. Luch knew that Mercille was going to be transferred to a Veterans Administration residential facility for treatment, and Luch wanted his letters to be mailed from outside the prison, to avoid the chance that they would be read by corrections officials. Mercille told the court that he later decided to turn the letters over to the police because he thought that Luch was a trouble-maker, and because he thought that Luch was guilty of murdering his wife.

Mercille denied stealing the letters and he denied asking Luch for money. Mercille also testified that if Luch had asked him to return the letters before Mercille turned them over to the police, he would have returned them.

After hearing this conflicting testimony, the trial judge found that Luch's testimony about the documents and the envelopes was false — *i.e.*, that Luch was not credible when he asserted that these documents were intended for his attorney, and not for his children. Instead, the judge found that Mercille's account of events was credible.

In particular, the judge noted that many of Luch's handwritten notations on the transcripts were worded in a way that showed that the notation was intended as a communication to the speaker (*i.e.*, the child who gave the statement), not a communication to some third-party evaluator such as Luch's attorney.

Based on these findings, the judge concluded that the documents were not attorney-client documents, and that they therefore were not privileged: "They are not from ... client to attorney."

On appeal, almost all of Luch's arguments pointedly ignore the trial judge's findings. That is, Luch's arguments are premised on the assertion that the documents were protected by the attorney-client privilege because Luch prepared these documents for his attorney, not for his children. But the trial judge explicitly rejected this assertion when he issued his findings, and Luch has not shown that the judge's findings are clearly erroneous.

Luch does raise one procedural challenge to the judge's findings: he argues that when a criminal defendant asserts that statements or documents are covered by the attorney-client privilege, and if the defendant presents some evidence in favor of the asserted privilege, a judge must *presume* that the defendant's assertion of privilege is correct — that is, the judge must resolve any conflicts in the evidence against the government and in favor of the claim of privilege.

This position is contrary to established law. When a party or witness asserts an evidentiary privilege, it is their burden to establish that the privilege applies. [11] More specifically, when a defendant asserts the attorney-client privilege, the burden of proving each element of the privilege rests upon the defendant. [12]

---

[11]  *N.G. v. Superior Court*, 291 P.3d 328, 336 (Alaska App. 2012). *See Fuller v. City of Homer*, 75 P.3d 1059, 1063 (Alaska 2003) (addressing the deliberative process privilege); *James v. State*, 75 P.3d 1065, 1068 (Alaska App. 2003), and *Gyles v. State*, 901 P.2d 1143, 1149 (Alaska App. 1995) (addressing the privilege against self-incrimination); and *Plate v. State*, 925 P.2d 1057, 1066 (Alaska App. 1996) (addressing the privilege for confidential communications to a clergyman).

[12]  *See People v. Meredith*, 631 P.2d 46, 50 (Cal. 1981); *Zimmerman v. Superior Court*, 163 Cal.Rptr.3d 135, 145 (Cal. App. 2013); *Black v. State*, 920 So.2d 668, 671 (Fla. App.
(continued...)

Luch was not entitled to a presumption that he was telling the truth when he described his purpose for preparing the documents and when he identified the intended recipients of those documents. Much less was Luch entitled to the "merely some evidence" rule that he proposes — a rule that would require the trial judge to completely ignore any conflicting evidence and to resolve all evidentiary conflicts in favor of Luch's claim of privilege.

Rather, the judge was required to do precisely what he did here: allow the parties to present their evidence pertaining to the claim of attorney-client privilege, and then make findings of fact and credibility. Here, the judge found, based on the testimony and on the content of the documents themselves, that Luch's explanation of the documents was not credible. Specifically, the judge found that the documents were not intended to be communications to Luch's attorney; rather, they were intended to be communications to Luch's children — to influence their testimony. The judge accordingly ruled that the attorney-client privilege did not cover the documents.

The judge's findings of fact are not clearly erroneous. Accordingly, we uphold the judge's ruling that the documents were not privileged.

---

[12] (...continued)
2006); *State v. Tensley*, 249 N.W.2d 659, 661 (Iowa 1977); *Purcell v. Dist. Attorney for Suffolk Dist.*, 676 N.E.2d 436, 440 (Mass. 1997); *State ex rel. Stivrins v. Flowers*, 729 N.W.2d 311, 316 (Neb. 2007); *People v. Mitchell*, 448 N.E.2d 121, 123 (N.Y. 1983); *State v. Love*, 271 S.E.2d 110, 112 (S.C. 1980); *State v. Rickabaugh*, 361 N.W.2d 623, 624-25 (S.D. 1985); *State v. Kennison*, 546 A.2d 190, 193 (Vt. 1987); *United States v. Stern*, 511 F.2d 1364, 1367 (2nd Cir. 1975); *United States v. Harrelson*, 754 F.2d 1153, 1167 (5th Cir. 1985).

*Luch's argument that the trial judge should have allowed Luch's attorney to introduce evidence of Luch's statements to the police following his arrest, while he was being transported to the police station*

After Luch shot his wife, he returned the gun to its storage place in the garage, he ingested a handful of pills, and then he went outside. The police found him walking along the street, and he was taken into custody.

While Luch was being transported to the police station in a patrol car, the police recorded their conversation with him. In this conversation, Luch volunteered various statements about the shooting — statements that were not solicited by police questioning:

> *Luch*: There's no excuse for that. I just couldn't control myself anymore. I just lost control. There's nothing I could do. (Indiscernible) break. Control. I just (indiscernible). I just lost it. I just lost it. Wish I had wifi; I could update my blog. I just don't want to make a spectacle out of myself and embarrass my kids. That's the only thing I want. I have good kids, and they're going to hate me now. I just don't want to embarrass them. I did something terrible to my kids. Lord, they're never going to forgive me.

Anticipating that Luch's attorney might wish to introduce these statements at trial, the State filed a motion *in limine* to bar the defense from introducing these statements. Luch's attorney opposed the State's motion, arguing that Luch's statements to the police were admissible as present sense impressions under Alaska Evidence Rule 803(1), as excited utterances under Alaska Evidence Rule 803(2), or as evidence of Luch's then-existing mental state under Alaska Evidence Rule 803(3).

After reviewing the audio recording and the transcript of Luch's conversation with the police in the patrol car, the trial judge ruled that Luch's out-of-court statements were inadmissible hearsay.

In particular, the judge found — "[having] listened to the tape" — that it was "abundantly clear from the nature of [Luch's] statements" and from Luch's "very calm demeanor" that Luch's statements were not excited utterances. The judge also rejected the contention that Luch's statements reflected his "present sense impression". Finally, the judge rejected the argument that Luch's statements qualified as statements of his then-existing mental state.

On appeal, Luch argues that the judge reached the wrong conclusion — that, in fact, Luch's statements in the patrol car qualified for admission under each of these three exceptions to the hearsay rule.

With regard to whether Luch's statements qualified as excited utterances under Evidence Rule 803(2), the ultimate question is whether, at the time Luch made these statements, he was speaking "under the stress of excitement" caused by the shooting — whether the shooting had produced in Luch a condition of excitement which temporarily stilled his "capacity for reflection", thus "produc[ing] utterances free of conscious fabrication." [13]

This is a question of fact — and, for this reason, an appellate court must uphold the trial judge's finding unless it is clearly erroneous. [14]

As we have explained, the trial judge found, after listening to the audio recording, that Luch's statements in the patrol car were not excited utterances because of Luch's calm demeanor, and based on the nature of the statements themselves. The

---

[13] *Davis v. State*, 133 P.3d 719, 727-28 (Alaska App. 2006).

[14] *Sipary v. State*, 91 P.3d 296, 305-06 (Alaska App. 2004).

record provides ample support for the judge's conclusion. That conclusion is therefore not clearly erroneous, and we accordingly uphold the judge's ruling on this issue.

With regard to whether Luch's statements qualified as present sense impressions under Evidence Rule 803(1), the test is whether Luch's statements about the shooting were made "while [he] was perceiving the event ... , or immediately thereafter". As we explained in *Davis v. State*, the defining characteristic of a statement of present sense impression is its spontaneity — "the speaker's lack of reflection about what he or she should be saying." [15] To qualify as a statement of present sense impression, the statement must be uttered while the speaker is observing the event or condition at issue, or "immediately thereafter". [16]

Luch's statements in the patrol car were obviously not made while the shooting was occurring, so the question is whether those statements were made "immediately thereafter" as that phrase is used in Evidence Rule 803(1).

In *Davis*, we explained that the phrase "immediately thereafter" is meant to describe circumstances where "there is hardly any interval between the observation and the statement describing the observation — and, thus, no time for reflection." [17] In Luch's case, the trial judge could reasonably find that Luch's statements in the patrol car did not meet this test. Accordingly, we uphold the trial judge's ruling on this issue.

This leaves Luch's argument that his statements qualified for admission under Evidence Rule 803(3) as statements describing Luch's then-existing mental or emotional condition.

---

[15] *Davis v. State*, 133 P.3d 719, 727 (Alaska App. 2006).

[16] *Ibid.*

[17] *Ibid.*

– 34 – 2586

Some of Luch's statements in the patrol car were explicit descriptions of his mental condition at the time of the shooting. But when Evidence Rule 803(3) speaks of statements that describe a "then-existing" mental or emotional condition, the rule is not speaking of statements in which a person describes their mental or emotional condition at some earlier time. Evidence Rule 803(3) is confined to a person's description of their mental or emotional condition *at the time they are speaking.*

As explained in the first paragraph of the Commentary to Alaska Evidence Rule 803(3), this rule "is essentially a specialized application" of Evidence Rule 803(1) — *i.e.*, a specialized application of the rule that covers statements of *present* sense impression. Evidence Rule 803(3) does not apply to a person's assertions about a mental or emotional condition that they experienced in the past. [18]

*See also* Saltzburg, Martin, and Capra, *Federal Rules of Evidence Manual* (11th ed. 2015), Rule 803, Vol. 4, p. 803-30 (explaining that the corresponding federal hearsay exception does not apply to "[s]tatements of a past state of mind or physical condition").

For this reason, Luch's description in the patrol car of his state of mind at the time of the shooting was not admissible under Evidence Rule 803(3).

In sum, Luch's statements in the patrol car were not admissible under any of the three hearsay exceptions that he proposes. We therefore uphold the trial judge's ruling regarding this hearsay evidence.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

[18] *Kelly v. State*, 116 P.3d 602, 604 (Alaska App. 2005), and at 610 (Judge Mannheimer, concurring).